**2024 UT App 23**

# THE UTAH COURT OF APPEALS

MOULDING INVESTMENTS, LLC AND
FRANKLIN HILL REGIONAL LANDFILL, LLC,
Appellants,

*v.*

BOX ELDER COUNTY, JEFF HADFIELD,
JEFF SCOTT, AND STAN SUMMERS,
Appellees.

Opinion
No. 20220433-CA
Filed February 23, 2024

First District Court, Brigham City Department
The Honorable Spencer D. Walsh
No. 200100101

Chris R. Hogle and Michelle Quist,
Attorneys for Appellants

Barton H. Kunz II, Attorney for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 Moulding Investments, LLC (Moulding[1]) wants to operate a landfill on property that it owns in Box Elder County (the County). After the County denied Moulding's request for a necessary zoning change, Moulding sued, alleging that the

---

1. The case at issue was also brought on behalf of Franklin Hill Regional Landfill, LLC, the entity that would assume "ownership and control of the property" from Moulding "upon final approval of the landfill." Moulding and Franklin have referred to themselves collectively as Moulding in their briefs, and we'll do the same.

County had violated Moulding's equal protection rights by improperly favoring another proposed landfill within the County. The district court dismissed Moulding's complaint for failure to state a claim upon which relief could be granted. Moulding now appeals. For the reasons set forth below, we affirm.

## BACKGROUND[2]

### *The Promontory Point Landfill*

¶2    In 2003, some landowners petitioned the County for a conditional use permit to operate a commercial landfill that would be referred to as the Promontory Point Landfill (the PPL). The PPL would be located near the Promontory Point peninsula in the southernmost portion of the County and "within a half-mile from the Great Salt Lake." The PPL would be accessible by rail, but it would otherwise be accessible only "by several miles of county road," the last few miles of which were unpaved. When the Box Elder County Planning Commission (the Planning Commission) held a public meeting on the petition in June 2003, there was some opposition. After the Planning Commission discussed access, public safety, and environmental concerns with the owners, the Planning Commission recommended approving the petition. The petition then went to the Box Elder County Commission (the County Commission), which unanimously approved it. The proposed PPL was not subsequently put into operation, however, and this conditional use permit expired by 2009.

¶3    Around the time that this conditional use permit expired, the County Commission adopted Ordinance 319. This ordinance

---

2. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Lewis v. U.S. Bank Trust*, 2020 UT App 55, n.1, 463 P.3d 694 (quotation simplified).

required all landfills to be located in a newly created Municipal Solid Waste (MSW) zone. The PPL had a new owner by this point, and this owner applied to have the PPL property rezoned as an MSW zone. The Planning Commission discussed this application at a November 2009 meeting. The minutes from this meeting show that just a single comment was made about the MSW application, with a citizen asking "if re-zoning this property would have any effect on the land value of his property in the area." The Planning Commission ultimately voted to recommend that the County Commission approve the rezoning request. When the matter was brought to the County Commission in January 2010, another citizen expressed concern about the effects that the proposed zoning change (and, presumably, a landfill) would "have on private property." At the close of the discussion, the County Commission voted to approve the PPL's request for a zone change to a MSW zone. In September 2011, the PPL received a permit from the Utah Department of Environmental Quality (the DEQ) to operate a landfill. After receiving this permit, however, the PPL did not obtain another conditional use permit at that time, which was necessary to allow it to begin operating the landfill.

*Moulding's Proposed Landfill*

¶4     Moulding owns 2,200 acres of private property in the County, located approximately eight miles southeast of Snowville within the Hansel Valley. The property has been and still is unzoned. In April 2014, Moulding submitted an application to the County seeking to rezone 225 acres of its property as an MSW zone, with the intent to operate a landfill on it. That same day, Moulding also applied to the DEQ for a permit to operate the proposed landfill. At that time, the PPL was still not operating, and the County had only one operating landfill.

¶5     During a May 2014 meeting, the Planning Commission considered Moulding's application for an MSW zoning change. During the public comment period, several people raised concerns about culinary water contamination, seismic activity,

flooding, local wildlife, the location of the landfill, and traffic to the site. At Moulding's request, the Planning Commission tabled Moulding's application so "that the concerns raised at the public hearing could be addressed by the appropriate agency within" the DEQ.

*The PPL Receives a Conditional Use Permit*

¶6     In March 2015, the PPL and the County signed a letter of intent for the County to purchase the PPL. The letter laid out the general terms of a proposed purchase agreement, but it was not binding on either party. In August 2015, as part of ongoing negotiations, the County contemplated the possibility of instead entering into a profit share agreement by which the County would own 60% of the PPL and share in its profits. But after the county attorney expressed concerns about the proposal and the public mounted considerable opposition, the County decided not to go through with this purchase, leaving the PPL fully private.

¶7     In November 2015, the County Commission was comprised of Jeff Hadfield, Jeff Scott, and Stan Summers. Of some note for this appeal, these commissioners were not the same commissioners who had approved the PPL's earlier zoning application. This new County Commission approved Ordinance 414, which essentially overhauled the County's MSW zoning ordinances. Among the changes was a reclassification of the MSW zone to a Solid Waste (SW) zone.

¶8     Due to an "oversight," the PPL's zone was not updated when Ordinance 414 was enacted, meaning that it was still zoned as the now-defunct MSW zone. The Planning Commission approved a rezoning of the PPL to a SW zone at a June 2016 meeting, noting that the PPL was "overlooked when the other MSW zones in the county were re-zoned correctly." The Planning Commission unanimously recommended approval of the proposed rezoning, and the County Commission approved it a month later.

¶9     In March 2017, the Planning Commission approved a second conditional use permit (replacing the one that had expired in 2009) for the PPL to operate a landfill.

*Moulding's Renewed Request for a Zone Change*

¶10     In the fall of 2019, the DEQ issued a decision granting Moulding a Class I landfill permit. Despite public comments that raised concerns about potential environmental or wildlife impacts, DEQ officials concluded that none of these issues warranted denial of the request.

¶11     After Moulding's DEQ permit was issued, the relevant County authorities again considered Moulding's previously tabled 2014 application for a zone change. On August 20, 2020, the Planning Commission met to consider Moulding's application. At that meeting, Planning Commission members discussed several potential reasons for denying the application, including the likelihood of flooding in the area, potential safety impacts on the groundwater, public opposition to the possibility of bringing other counties' garbage into the County, and the fact that "the existing capacity of the landfill presently in Box Elder County . . . has a 100-year lifespan." At the close of the discussion, the Planning Commission unanimously recommended denying Moulding's application based on the following findings:

> public opposition, aquifer recharge area issue, elevation of the watershed being prone to flash flooding, it is a known seismic zone, adverse effect on neighboring properties, property values and future growth of the area . . . no existing need for an additional landfill in Box Elder County[, and] . . . the proposal is not harmonious with the general plan and presentation of Box Elder County.

The motion recommending denial passed unanimously.

¶12 On September 2, 2020, the County Commission met and reviewed the Planning Commission's recommendation to deny Moulding's application for a zone change. At that meeting, a commissioner stated that "the Planning Commission doesn't take anything lightly and they do their due diligence when making decisions." Another commissioner noted that he "was at the public hearing and saw the public outcry against" Moulding's proposed landfill and that he thought there were "legitimate concerns" with the application. And another commissioner pointed out that even if concerns with the application were "mitigated," there was "still overwhelming opposition[] to [Moulding's] landfill."

¶13 At the close of the discussion, a commissioner made a motion to deny Moulding's application based on the following findings:

> Public opposition; Located in an aquifer recharge area; Location is prone to flash flooding; Location is in an area prone to seismic activity; Adverse effects on neighboring properties (value, litter, smell, traffic); Not a need (especially when considering existing capacity in the county, the adverse impacts, and public opposition); [and] Adverse impact (visual, litter) on the I-84 corridor, a corridor frequently used by travelers in the western U.S.

This motion passed unanimously.

*Procedural History*

¶14 In October 2020, Moulding sued the County as well as Commissioners Jeff Hadfield, Jeff Scott, and Stan Summers.[3] In an

---

3. Throughout the litigation (including in this appeal), the County and these individual commissioners have been represented and have proceeded together. Going forward, we'll refer to them

(continued…)

amended complaint that ultimately governed the case (and which, for simplicity, we'll refer to as "the complaint" moving forward), Moulding alleged that the County had violated its equal protection rights under both the Utah and the United States Constitutions. The complaint alleged that the County had violated Moulding's rights "under [the] color of state law" by treating Moulding "differently from others similarly situated"—namely, the PPL—and that the County had "done so with ill will and without any rational or legitimate basis."

¶15 The complaint identified some similarities between the proposed Moulding landfill and the PPL, such as that "both landfills [are] located within Box Elder County, both landfills were publicly opposed on similar concerns, and both landfills are not situated within a landfill corridor as required by" ordinance. The complaint also acknowledged the differing chronologies and approval histories of the two projects, noting that the PPL had first sought "a conditional use permit . . . to operate . . . as a commercial landfill" in 2003 and then detailing the history of the zoning approvals that the PPL had obtained through 2016. When recounting that history, the complaint referred to and quoted from a series of minutes from Planning Commission and County Commission meetings spanning from 2003 to 2020, and many of those minutes were attached as exhibits to the complaint.

¶16 The County filed a motion to dismiss the complaint under rule 12(b)(6) of the Utah Rules of Civil Procedure. In this motion, the County argued that Moulding had not adequately alleged "totally illegitimate animus unrelated to the County Commissioners' positions" and that the PPL did not qualify as a similarly situated comparator as required to support an equal protection claim. As exhibits to its motion, the County attached minutes from several County Commission and Planning

---

collectively as "the County" unless the distinction is relevant to a particular point.

Commission meetings, as well as copies of relevant County ordinances.

¶17 After a hearing, the district court issued a written decision granting the County's motion to dismiss. The court concluded that Moulding had "failed to identify a comparator that is similarly situated in all material respects," and it also concluded that Moulding had failed "to establish that the County acted out of a totally illegitimate animus unrelated to their official duties in denying [Moulding's] application."

¶18 With respect to the "similarly situated" element of this claim, the court concluded that the PPL was not a similarly situated comparator for several reasons. First, "a decade passed between the time the County Commission considered [the PPL's] application and Moulding's application." Second, the "County Commissioners making the decision were different." Third, when the owners of the PPL applied, there was only one other "landfill operating in the unincorporated County," whereas when Moulding applied, the PPL had already been approved, which the court viewed as a "material distinction." Finally, the court referred to the "vastly different public responses" to the two applications.

¶19 With respect to the animus element, the court further found that "Moulding relie[d] on conclusory allegations" and failed to "marshal[] specific facts that show that the County Commissioners were motivated by the required animus." And the court also was not persuaded that "Moulding's allegation that the County was motivated by a financial stake in the [PPL]" would be enough to establish that the County acted based on animus toward Moulding.

¶20 Based on these conclusions, the district court dismissed Moulding's complaint. Moulding timely appealed.

ISSUE AND STANDARD OF REVIEW

¶21 Moulding appeals the district court's dismissal of its complaint, challenging the court's conclusions relating to both the "similarly situated" and "animus" elements of the equal protection claim. "Because a trial court's grant or denial of a motion to dismiss is a question of law, the standard of review is correctness." *South Jordan City v. Summerhays*, 2017 UT App 18, ¶ 5, 392 P.3d 855 (quotation simplified). This standard of review grants "no deference to the decision of the district court." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275; *see also Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 14, 203 P.3d 962.

ANALYSIS

¶22 The district court dismissed Moulding's complaint under rule 12(b)(6) of the Utah Rules of Civil Procedure. A rule 12(b)(6) motion "should be granted only if, assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275 (quotation simplified). When reviewing a motion to dismiss, "neither the district court nor this court is required to review voluminous extraneous materials in an effort to address deficiencies in the complaint and identify facts that support a plaintiff's legal theories. Instead, the factual allegations made in the complaint must be the focus of the inquiry." *Rusk v. University of Utah Healthcare Risk Mgmt.*, 2016 UT App 243, ¶ 7, 391 P.3d 325 (per curiam) (quotation simplified).

¶23 Moulding's complaint alleged an equal protection violation under both the Utah and United States Constitutions. "Equal protection of the law requires that similarly situated persons be treated alike." *Brian High Dev., LC v. Brian Head Town*, 2015 UT App 100, ¶ 9, 348 P.3d 1209 (quotation simplified). "When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among a larger

class on the basis of a tenuous justification that has little or no merit." *Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶ 72, 438 P.3d 913 (quotation simplified).[4]

¶24 On appeal, Moulding suggests that its equal protection claim is a class-of-one claim. A class-of-one claim exists when a plaintiff brings an equal protection claim without alleging membership in a class or group. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). A plaintiff properly pleads a class-of-one claim "where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*; *see also Patterson v. American Fork City*, 2003 UT 7, ¶ 33, 67 P.3d 466; *Haik*, 2019 UT App 4, ¶ 73. "It is insufficient to allege an uneven enforcement of the law; what is required is a showing of a totally illegitimate animus toward the plaintiff by the defendant." *Haik*, 2019 UT App 4, ¶ 73 (quotation simplified).

¶25 As an initial matter, Moulding argues that because the district court was considering a rule 12(b)(6) motion to dismiss, certain portions of its ruling were erroneous because the court improperly relied on facts outside the complaint. "The rules are clear that documents attached to a complaint are incorporated into the pleadings for purposes of judicial notice and are fair game

---

4. Our supreme court has held that the Utah Constitution's "uniform operation of laws provision" and the United States Constitution's Equal Protection Clause "embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 14, 211 P.3d 382 (quotation simplified). The ruling below did not meaningfully differentiate between the state and federal constitutions, and the parties on appeal likewise have not suggested that there's a difference that would matter to this case either. Given the decision and briefing, we have no need to decide whether there might be such a distinction that might matter in some future case.

for this court to consider in addition to the complaint's averments." *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 10, 104 P.3d 1226. In the rule 12(b)(6) context, courts are also "permitted to consider documents referred to in the complaint or that are central to the complaint, as well as certain types of public records." *Calsert v. Estate of Flores*, 2020 UT App 102, ¶ 12 n.4, 470 P.3d 464 (quotation simplified). In the County's view, the various documents identified by Moulding fit within this rule and do not require the motion to dismiss to be treated "as one for summary judgment." *See* Utah R. Civ. P. 12(b). We need not resolve the parties' disputes about which documents were or were not appropriately considered. For purpose of this appeal, we'll confine our consideration to the complaint itself and the documents Moulding directly referenced therein.[5]

¶26  Against that backdrop, Moulding argues that the district court erred in three respects: first, by affording too much deference to the County's decision in violation of Utah's liberal pleading standard; second, by concluding that Moulding had not alleged sufficient facts to show an illegitimate animus; and third, by concluding that Moulding had not alleged sufficient facts to show that there was a similarly situated comparator. We agree with the district court that Moulding did not allege sufficient facts to establish that there was a similarly situated comparator. As a result, we need not reach the other arguments, and we offer no opinion as to their merit.

¶27  As noted, this element of a class-of-one equal protection claim turns on whether the government treated the plaintiff

---

5. Of note, the complaint specifically referred to Planning Commission meetings that occurred in June 2003, May 2014, June 2016, and August 2020, as well as County Commission meetings that occurred in July 2003, January 2010, August 2015, July 2016, and September 2020. The complaint also included as exhibits the minutes of the May 2014 Planning Commission meetings, the August 2015 County Commission meeting, and the September 2020 County Commission meeting.

"differently from other similarly situated persons." *Patterson*, 2003 UT 7, ¶ 34. We've held that to support this element, the plaintiff "must identify comparators that are similarly situated in *all* material respects, which is a substantial burden" in the land use context "because each property has unique characteristics." *Farley v. Utah County*, 2019 UT App 45, ¶ 31, 440 P.3d 856 (emphasis added, quotation otherwise simplified). While Utah's caselaw is otherwise somewhat sparse with respect to this element, the First Circuit has persuasively held that "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (quotation simplified). In the First Circuit's view, the "proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Id.* In language similar to that which we used in *Farley*, the First Circuit explained that the "similarly situated requirement must be enforced with particular rigor in the land-use context because zoning decisions will often, perhaps almost always, treat one landowner differently from another." *Id.* (quotation simplified).

¶28　The Tenth Circuit has expressed a similar view. In *Kansas Penn Gaming, LLC v. Collins* (a case that we cited favorably in *Farley*, 2019 UT App 45, ¶ 31), the Tenth Circuit held that the "similarly situated" requirement "is inevitably more demanding where a difference in treatment could legitimately be based on a number of different factors." 656 F.3d 1210, 1218 (10th Cir. 2011). The Tenth Circuit explained that this requirement prevents "a flood of claims in that area of government action where discretion is high and variation is common." *Id.*

¶29　In this case, Moulding's complaint alleged that its proposed landfill was "similarly situated with [the PPL] in that both are landfills located within Box Elder County, both landfills were publicly opposed based on similar concerns, and both landfills are not situated within a landfill corridor as required by"

a County ordinance. But even with these alleged similarities, there were still several key differences.

¶30    The principal difference was timing. The owners of the PPL first applied for a conditional use permit in 2003, and they received it that year. Although that conditional use permit later expired, the owners maintained the PPL's ability to eventually function as a landfill by seeking and obtaining necessary zoning changes in 2010 and again in 2016. By contrast, Moulding did not submit any landfill-related applications until the request for a zone change in 2014; after that request was tabled, it wasn't renewed for consideration again until 2020. Thus, while Moulding claims that it is similarly situated to the PPL, the timing alone shows otherwise. The owners of the PPL had obtained a conditional use permit over a decade before Moulding even applied for a zoning change, and the PPL owners had also obtained zoning changes a decade before the County denied Moulding's zoning request, which is the government action that ultimately led to Moulding's suit.[6]

¶31    As a related matter, different decision makers have been involved in making some of the relevant decisions. The PPL received a conditional use permit in 2003 and a zoning change in 2010, and those approvals were issued by prior versions of the County Commission (and comprised of entirely different commissioners) than the County Commission that denied Moulding's request for a zoning change in 2020. Thus, while Moulding is now suing Commissioners Hadfield, Scott, and

---

6. As we noted in the Background, the record indicates that the PPL received a second conditional use permit in 2017. But as discussed, for purposes of our Analysis, we're confining ourselves to the allegations set forth in the complaint, and the complaint itself does not allege that the PPL received this second conditional use permit. The complaint does allege, however, that the PPL received both an initial conditional use permit in 2003 as well as zoning approvals in 2010 and 2016—which, as discussed, place the PPL on different ground than Moulding.

Summers for treating Moulding differently than the PPL has been treated, the earlier decisions to grant the PPL's initial requests were made by different elected officials who may well have had entirely different political agendas.

¶32 Finally (and again relatedly), the PPL stands on different footing from Moulding because the PPL came first. Like the district court, we think it significant that the governmental decisions in question turned on whether to approve a proposed landfill. A local government could of course rationally decide that it should only have a certain number of landfills within its borders, and Moulding does not contend that the County here was constitutionally required to approve every such proposal. Indeed, as noted, one of the findings that the County Commission made in support of its denial of Moulding's zoning application was: "Not a need (especially when considering existing capacity in the county . . . )."

¶33 To be clear, the question of whether the County's decision to draw the line at two landfills was so irrational that it could support an equal protection claim turns on a different element than the one we're considering, which is whether the two proposed comparators were similarly situated. But even on that element, it still matters that the PPL had *already been approved* for a conditional use permit and for the necessary zoning change before Moulding had applied for a zoning change, much less before the County denied Moulding's request. In this sense, these were not two competitors who were contemporaneously vying for a single available permit. Rather, in the moments that form the basis for Moulding's suit (i.e., the County's consideration and denial of Moulding's request for a zoning change in 2020), the PPL already had the approvals that Moulding was now requesting. Simply put, an applicant who has already obtained an approval to conduct an activity is not similarly situated to an entity who begins seeking its own approval later. So here, when Moulding sought the necessary governmental approvals, it was doing so in a climate in which the PPL already had them; but when the PPL sought those approvals, the converse was not true. In this sense,

the PPL and Moulding applications were submitted to different County officials in different climates with respect to the number of approved landfills within the County's borders.

¶34   In the briefing, the County argued that there are other potential differences as well, such as differences of location and topography. Perhaps most notably, the County has also alleged that there were different levels of public opposition to the two proposals. But these arguments rely to some measure on documents and exhibits that at least arguably fall outside the scope of a proper analysis under rule 12(b)(6). In any event, we need not decide whether these additional differences also support the district court's ruling. Instead, we think those identified above are enough—namely, these proposals were filed at different times, they were considered (in part) by different sets of commissioners, and the PPL's initial application had been approved before Moulding ever submitted a proposal. In light of these differences, all of which are apparent on the face of the complaint alone, we agree with the district court that the PPL and Moulding were not similarly situated for purposes of a class-of-one claim. As a result, Moulding's complaint fails.

## CONCLUSION

¶35   For the foregoing reasons, we affirm the district court's dismissal of Moulding's complaint.

———————