**2024 UT App 132**

# THE UTAH COURT OF APPEALS

JENNIFER ORTEN AND SOPHIE ANDERSON,
Appellants,
*v.*
UTAH COUNTY, UTAH COUNTY BOARD OF COUNTY COMMISSIONERS,
JUAB COUNTY, JOHN CRIPPEN, MILLARD COUNTY, DEAN DRAPER,
AND DEIDRE HENDERSON,
Appellees.

Opinion
No. 20220782-CA
Filed September 19, 2024

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 220400417

Chad C. Shattuck, Attorney for Appellants

Sean D. Reyes, Stephen W. Geary, Scott D. Cheney,
and Gregory N. Hoole, Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

TENNEY, Judge:

¶1 Jennifer Orten and Sophie Anderson requested several election-related documents from Utah, Juab, and Millard counties (the Counties), pursuant to Utah's Government Records and Access Management Act (GRAMA). The Counties largely denied the requests. Orten and Anderson later filed a complaint in district court seeking judicial review of the denials. Lieutenant Governor Deidre Henderson intervened and then moved to dismiss the case, arguing that the Election Code rendered the requested documents non-public and therefore not subject to GRAMA's disclosure requirements. The district court granted the

motion, and Orten and Anderson now appeal. For the reasons set forth below, we affirm.

BACKGROUND[1]

¶2      In December 2021 and January 2022, Orten and Anderson separately requested four types of election-related documents from the Counties. Orten requested what she referred to as "Cast Vote Records" (the CVRs) and "Project Backup Databases"; Anderson requested what she referred to as "Ballot Images" and "Tabulator Tapes."[2] Orten and Anderson planned to share these documents with the public through "local and national broadcasts, podcast interviews, radio, and media events." The

---

1. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, n.2, 545 P.3d 781 (quotation simplified).

2. This court's usual practice is to designate any alterations to the record—including to capitalization—with brackets. *See RainFocus Inc. v. Cvent Inc.*, 2023 UT App 32, ¶ 6 n.7, 528 P.3d 1221 (noting that while members of this court often "make unbracketed changes to capitalization" in conjunction with a (quotation simplified) or (cleaned up) parenthetical, we don't do so when citing to the record on appeal). In this case, however, we note that for each of the four types of documents at issue, the names are sometimes capitalized in the record but sometimes not (and they're sometimes capitalized inconsistently within even the same document). To avoid both odd-seeming inconsistencies and unnecessary clutter, we'll capitalize the names of each type of requested document in each usage without noting whether we're altering the record in any particular instance. Where similar-sounding terminology appears in a statute or case, however, we'll leave the capitalization untouched from the original.

two also planned to give the documents to several advocacy organizations, as well as to local officials and state legislators.

¶3      With one partial exception, the Counties either denied or simply didn't respond to the requests.[3] The Counties that expressly denied the requests asserted that the documents were either "sealed" or "not public." The Counties didn't respond to subsequent administrative appeals.[4]

¶4      Orten and Anderson later filed a joint complaint in which they sought both judicial review of the denials and a preliminary injunction to prevent destruction of the documents during the pendency of litigation. Among other points, the two argued that because Utah law does not restrict the requested document types by name, they are presumed to be "public" under GRAMA.

¶5      Of some note, all four of these document types lack statutory definitions. In their complaint, Orten and Anderson defined the four document types as follows:

- "Ballot Images are copies of ballots and are not the originals."

-  A CVR "is a spreadsheet containing a sequential tally of the votes cast during the course of the election . . . ."

- The "Project Backup Database contains a backup of the election project database containing project files from the election management server tabulators and any external

---

3. Juab County initially granted Anderson's request in part and produced some Tabulator Tapes.

4. Under Utah Code section 63G-2-401(5)(b)(i), if "the chief administrative officer fails to make a decision on an appeal of an access denial within the time specified in Subsection (5)(a), the failure is the equivalent of a decision affirming the access denial."

drives, such as log files, reports, audio files, and backups of the ballots, etc."

- "Tabulator Tapes are the means for calculating vote totals and are not a ballot."[5]

¶6 The Lieutenant Governor filed a motion to intervene in the case, citing her role as "chief election officer of the State of Utah," and the district court granted that motion. After joining the case, the Lieutenant Governor filed a motion to dismiss pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, and the Counties joined in that motion. In that motion, the Lieutenant Governor argued that the Election Code comprehensively governs access to all "Election Materials," thereby removing them from GRAMA's reach. In her view, various provisions from the Election Code (such as its regulations governing access to and destruction of "ballots" and "election returns") demonstrate a legislative intent to broadly restrict all election-related documents.

¶7 The district court agreed with the Lieutenant Governor's arguments and granted the motion to dismiss. In its written ruling, the court ruled that the "Election Code comprehensively governs access to and the retention of documents related to an election." The court also concluded that the Election Code's "broadly defined categories of election-related materials—when combined with the equally broad definition of ballot and election returns—sweep within their scope" each of the four kinds of documents at issue. In this sense, the court ruled that "the Election Code trumps the provisions of GRAMA on which" Orten and Anderson relied. From there, the court ruled that the Election Code "restricts" or "limits access" to each kind of document that Orten and Anderson sought because, in the court's view, each

---

5. Orten and Anderson also initially asked for other types of records beyond these four, but they did not seek judicial review of the denials relating to the other types of documents.

kind of document qualified as either a "ballot" or an "election return."

## ISSUE AND STANDARD OF REVIEW

¶8      Orten and Anderson appeal the district court's dismissal of their complaint. "Because a trial court's grant or denial of a motion to dismiss is a question of law, the standard of review is correctness." *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, ¶ 21, 545 P.3d 781 (quotation simplified). "This standard of review grants no deference to the decision of the district court." *Id*. (quotation simplified).

## ANALYSIS

¶9      Under GRAMA, a "record is public unless otherwise expressly provided by statute." Utah Code § 63G-2-201(2). A record is "not public" if it is designated as "private, controlled or protected" by GRAMA or if "access is restricted pursuant to court rule, another state statute, federal statute, or federal regulation." *Id*. § 63G-2-201(3). In its ruling, the district court concluded that access to each type of document was "restricted" by "another state statute"—namely, the Election Code. Orten and Anderson challenge the district court's conclusion, but we agree with the district court with respect to each kind of document.

¶10      The Election Code sets forth a comprehensive scheme governing the processes associated with elections, and a number of its provisions restrict the public's right to access certain kinds of associated documents. To begin, election judges tally ballots. *Id*. § 20A-4-101 to –102. This process is open to the public at counting centers, *id*. § 20A-4-104(2)(b)(i), and it may be observed at a polling place by any voter who registers as a "watcher" with "the administering election officer," *id*. §§ 20A-4-102(7), 20A-3a-801(2). After the initial tally, the votes are "canvassed," or reviewed and

made official at county and state levels. *Id*. §§ 20A-4-301 to – 306.[6] The canvass is held in public. *See id*. § 20A-4-303(1)(b). At this stage, the board of canvassers receives access to "all ballots, registers, books, and forms related to the election," which it "inspect[s]" and "review[s]" before certifying the results. *Id*. § 20A-4-303(1)(a)(iii)–(b)(ii).

¶11    The statute states that as "soon as the returns are canvassed, the election officer shall file the election returns and papers produced before the board as required by Section 20A-4-202." *Id*. § 20A-5-408(2). But despite this internal cross-reference, section 20A-4-202 itself doesn't then use the same term "papers produced before the board." Instead, in the relevant provisions, section 20A-4-202 directs election officers to "ensure" that "all of the ballots and election returns" have been "sealed" by poll workers. *Id*. § 20A-4-202(1)(a)–(b); *see also id*. § 20A-4-104(10) (directing election officers to "seal and retain the programs, test materials, and ballots as provided in 20A-4-202" for ballots counted electronically); *id*. § 20A-4-106(1)–(2) (directing election officers to "store" manual "ballots" and "election returns" after the canvass and noting that, following storage, "the ballots may not be examined by anyone" outside of specific exceptions).[7] In accordance with these provisions, officers are directed to "deposit and lock the ballots and election returns in a safe and secure place." *Id*. § 20A-4-202(1)(c), (d)(ii). They are directed to then "preserve ballots for 22 months after the election or until the time has expired during which the ballots could be used in an election contest" and "preserve all other official election returns for at least

---

6. "'Canvass' means the review of election returns and the official declaration of election results by the board of canvassers." Utah Code § 20A-1-102(9).

7. Utah Code section 20A-4-106 was amended after Orten and Anderson filed their GRAMA request. *Compare* Utah Code § 20A-4-106 (2024), *with id*. (2022). Because the amendments are immaterial to the dispute in front of us, we cite the current version of the code for convenience.

22 months after an election"; "after that time," election officers are to "destroy them without opening or examining them." *Id*. § 20A-4-202(2)(b)–(d). By directing officials to retain and then destroy these "ballots" and "election returns" without opening or examining them, this statute clearly restricts access to both categories of documents.

¶12 Under this scheme, then, the question here is whether any of the document types at issue qualify as either "ballots" or "election returns." *Id.* If they do, their access is "restricted pursuant to . . . another state statute" and they are "not public" for purposes of GRAMA. *Id*. § 63G-2-201(3).

¶13 The Election Code defines these terms as follows:

- "'Ballot' means the storage medium, including a paper, mechanical, or electronic storage medium, that records an individual voter's vote," but it "does not include a record to tally multiple votes." *Id*. § 20A-1-102(3).

- "'Election returns' includes: (a) the pollbook, the military and overseas absentee voter registration and voting certificates, one of the tally sheets, any unprocessed ballots, all counted ballots, all excess ballots, all unused ballots, all spoiled ballots, the ballot disposition form, and the total votes cast form; and (b) the record, described in Subsection 20A-3a-401(8)(c), of voters contacted to cure a ballot." *Id*. § 20A-1-102(26).

¶14 With this framework, we now address each of the four kinds of documents at issue in this appeal.

*Ballot Images*

¶15 Orten and Anderson first request access to Ballot Images, which they defined in their complaint as being "copies of ballots" that "are not the originals." We have no difficulty concluding that these are restricted by the Election Code. Again, under the

Election Code, a "ballot" is "the storage medium, including a paper, mechanical, or electronic storage medium, that records an individual voter's vote." *Id*. § 20A-1-102(3)(a). Like the original ballot, a copy of a ballot would be a "storage medium" that "records an individual voter's vote." Thus, under the plain language of the statute, we conclude that a copy of a ballot would qualify as a ballot. Other courts have recognized as much in similar disputes. As pointed out by the Court of Appeals of New York, for example, holding otherwise "would allow statutory protections to be easily evaded merely by requesting a copy of an otherwise exempt document rather than the original—an interpretation that would effectively nullify" the statutory exemptions at issue. *Kosmider v. Whitney*, 132 N.E.3d 592, 603 (N.Y. 2019); *cf. AUDIT-USA v. Maricopa County*, 525 P.3d 279, 280-82 (Ariz. Ct. App. 2023) (denying a public records request for "ballot images" or "copies of the ballot images" where the statute mandated secure storage and eventual destruction of the originals).

¶16     If it had wished to do so, the legislature could have created a statutory exemption that would give the public a right of access to copies of the original ballots. But Orten and Anderson have not pointed to any section of the Election Code in which our legislature did. And to the seeming contrary, the Election Code provides that if "copies of ballots" are made pursuant to a formal legislative audit, these copies are "*not* a record" and are "*not* subject to disclosure" under GRAMA. Utah Code § 20A-4-202(5)(a), (b) (emphases added). It is hard to imagine why the legislature would specify that copies of ballots that are made for an authorized statutory purpose are not subject to public disclosure if the legislature also believed that a person making a GRAMA request can simply request copies of the originals for their own purposes and thus obtain access to them.

¶17     Resisting this conclusion, Orten and Anderson point to various policy considerations that, in their view, suggest that the restrictions on public access to the original ballots should not apply to copies. For example, they point to a news article about a

decision made by the Salt Lake District Attorney's office in 2002 to release some Ballot Images in response to a GRAMA request. In that article, a local official explained the apparent reasoning for this decision as follows: "the actual ballots are protected by state law to prevent tampering or damage, but the electronic files can be made public because they do not contain personal information."[8] Orten and Anderson echo this argument, contending that because Ballot Images do not contain "any private information or personally identifying data," there "is no identifiabl[e] public policy interest" in favor of restricting access.

¶18  An isolated statement from a single public official that was made 20 years ago is of course not binding on this court now, particularly when it stands in contrast to the plain language of a statute. Moreover, protecting the privacy of personally identifying data is not the only "identifiabl[e]" policy interest in play. In GRAMA's own statement of "Legislative intent," the legislature recognized that, separate from the "right of privacy in relation to personal data gathered by governmental entities," there's a "public policy interest in allowing a government to restrict access to certain records . . . for the public good." *Id*. § 63G-2-102(1)–(2). And on this front, we agree with the Lieutenant Governor that the Election Code's provisions restricting access to various kinds of documents may promote a number of identifiable public purposes, including "ballot secrecy, anti-tampering measures, accuracy, and finality." *See also Kosmider*, 132 N.E.3d at 603 (recognizing these same interests). And here, the interest in finality identified by the Lieutenant Governor seems especially relevant to restricting access to copies of ballots outside the context of a formal election contest.

¶19  In any event, "it is elementary that we do not seek guidance from . . . relevant policy considerations when the statute is clear

---

8. *See* Josh Loftin, *GOP to get '02 election files*, Deseret News (Jan. 17, 2003), https://www.deseret.com/2003/1/17/19699500/gop-to-get-02-election-files [https://perma.cc/Q4V4-TEEN].

and unambiguous."[9] *In re R.B.F.S.*, 2012 UT App 132, ¶ 15, 278 P.3d 143 (quotation simplified). And as indicated, we believe that under the plain language of the Election Code, the Ballot Images that Orten and Anderson requested qualify as "ballots." As a result, they're restricted by the Election Code and thus not publicly accessible under GRAMA. The district court therefore did not err in dismissing this portion of the complaint.

*The CVRs*

¶20    Orten and Anderson next request access to Cast Vote Records or CVRs. According to their complaint, a CVR "is a spreadsheet containing a sequential tally of the votes cast during the course of the election."

¶21    The Lieutenant Governor initially argues that these reports are restricted because they qualify as ballots. We have some skepticism as to whether this is so. After all, the Election Code states that the term "ballot" "does not include a record to tally multiple votes." Utah Code § 20A-1-102(3)(b). And on the face of the complaint, a CVR is alleged to be indeed just that—a "spreadsheet containing a sequential tally of the votes."

¶22    But we need not definitively decide this question because we agree with the district court's conclusion that access to the

---

9. One exception to this general principle is found in the absurdity doctrine. *See Bagley v. Bagley*, 2016 UT 48, ¶¶ 27–28, 387 P.3d 1000 (explaining that courts will "reform[] unambiguous statutory language" under the absurdity doctrine only where "the operation of the plain language" is "so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner" (quotation simplified)). But Orten and Anderson have not argued that this doctrine applies. And given the policy considerations cited by the Lieutenant Governor, we cannot say that no rational legislator could have intended for Ballot Images to be treated in the same way as ballots.

CVRs is still restricted under the statutory scheme set forth in Utah Code section 20A-4-202(2)(b)–(d).[10]

¶23 As noted, the term "Election returns"

> includes: (a) the pollbook, the military and overseas absentee voter registration and voting certificates, one of the tally sheets, any unprocessed ballots, all counted ballots, all excess ballots, all unused ballots, all spoiled ballots, the ballot disposition form, and the total votes cast form; and (b) the record, described in Subsection 20A-3a-401(8)(c), of voters contacted to cure a ballot.

*Id*. § 20A-1-102(26). And as the CVR is defined in the complaint— "a spreadsheet containing a sequential tally of the votes cast during the course of the election"—the CVR is not an item that's set forth in this list. But this doesn't end the statutory inquiry.

---

10. In reference to this same statutory scheme, the district court ruled that the "broadly defined categories of election-related materials—when combined with the equally broad definition of ballot and election returns—sweep within their scope cast vote records, project backup databases, and tabulator tapes Plaintiffs seek by way of a GRAMA request." In her brief, the Lieutenant Governor adopts this same framing, asserting that "ballots" and "election returns" together constitute a category of "[e]lection materials" that are restricted under Utah Code section 20A-4-202(2), and she then asserts that the CVRs are restricted under this rubric.

At the risk of splitting hairs, however, we note that the scheme at issue—section 20A-4-202(2)—doesn't refer to "[e]lection materials." Rather, as explained, it restricts access to "ballots" and "election returns." Thus, while we agree with most of the framing set forth by the Lieutenant Governor and the district court, we slightly diverge in that we conclude that the document types at issue qualify as "election returns."

After all, this list is preceded by the introductory verb "includes," which thus indicates that the list is non-exhaustive. *See, e.g., Mallory v. Brigham Young Univ.*, 2014 UT 27, ¶ 16, 332 P.3d 922 (holding that a statute's use of the word "includes" before a list "clearly contemplated" the possibility that something could satisfy the overarching term even if it didn't "fit[] neatly into one of the listed categories" (quotation simplified)); *Boyle v. Christensen*, 2011 UT 20, ¶ 27, 251 P.3d 810 ("When 'including' precedes a list, its common usage is to indicate a partial list."); *Asset Acceptance LLC v. Utah State Treasurer*, 2016 UT App 25, ¶ 21 n.10, 367 P.3d 1019 (noting that "'including' or 'includes' is a somewhat unique word in the English language, particularly with regard to its legal usage, because it has long been held to unambiguously indicate a non-exhaustive list").

¶24 In our view, the express terms of three provisions from the Election Code work together to restrict access to the CVRs.

- First, as noted earlier, the election officer is required to "make available to the board of canvassers . . . all ballots, registers, books, and *forms related to the election*." Utah Code § 20A-4-303(1)(a)(iii) (emphasis added).

- Second, the Election Code provides that after this canvass is complete, officers must "file the election returns and *papers produced before the board* as required by Section 20A-4-202." *Id*. § 20A-5-408(2) (emphasis added).

- Third, as also noted, section 20A-4-202 itself doesn't use the phrase "papers produced before the board." Instead, in subsection (2), it sets forth a storage-and-disposition scheme for "ballots" and "all other official election returns." *Id*. § 20A-4-202(2)(b), (c). It then provides that for "ballots" and "election returns," the election officer shall, after the designated time, "destroy them without opening

or examining them," *id.* § 20A-4-202(2)(d), thereby restricting the public's access to them.[11]

¶25 Under this three-part sequence, we agree with the district court that access to the CVRs is restricted. First, by their own account, Orten and Anderson are requesting a "spreadsheet" kept by election officials that "contain[s] a sequential tally of the votes cast during the course of the election." As a matter of plain language, such a spreadsheet would qualify as a "form[] related to the election" for purposes of section 20A-4-303(1)(b)(i). *Id.* § 20A-4-303(1)(a)(iii). Moreover, we note that sections 20A-4-303(1)(a)(iii) and -303(1)(b)(i) refer to "*all* . . . forms related to the election" and "*any* . . . forms requested by the board of canvassers." (Emphases added.) The legislature's inclusion of the words *all* and *any* further suggests that the legislature intended for this first step to apply broadly.

¶26 Second, because these spreadsheets qualify as official "forms related to the election," *id.* § 20A-4-303(1)(a)(iii), they're properly considered to be part of the "election returns and papers produced before the board" that, under section 20A-5-408(2), must be "file[d]" under the terms set forth in section 20A-4-202.

¶27 This leaves the final step: whether, for purposes of section 20A-4-202(2), they qualify as "election returns" for which access is restricted. We conclude that they do.

---

11. Utah Code section 20A-4-202(3)(a) sets forth a different filing scheme for "all tabulating cards and other materials used in the programming of the automatic tabulating equipment." No one has contended that the CVRs, as defined, would constitute "tabulating cards" or "materials used in the programming of the automatic tabulating equipment." Thus, the filing scheme set forth in section 20A-4-202(2) (which governs "ballots" and "election returns") would be the only potentially applicable provision from section 20A-4-202.

¶28    When interpreting statutory schemes, Utah courts often apply the "'whole-text canon,'" which "'calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.'" *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 12, 428 P.3d 1096 (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)); *see also Utah Am. Energy Inc. v. Labor Comm'n*, 2021 UT App 33, ¶ 15, 484 P.3d 1195 (holding that to "ascertain the plain meaning of statutory text, we read it in light of its linguistic, structural, and statutory context," and "each provision is considered in the context of the overall statutory scheme" (quotation simplified)).

¶29    Here, since the legislature broadly stated (under the second step) that election returns and papers produced before the board are filed under the terms set forth in section 20A-4-202, and since that scheme itself is plainly restrictive, we see no reason to conclude that the legislature intended to differentiate between "election returns" and "papers produced before the board" for these purposes. Instead, considering how this "overall statutory scheme" operates, *Utah Am. Energy Inc.*, 2021 UT App 33, ¶ 15, we believe that the phrase "papers produced before the board" functions as an add-on to "election returns" in a belt-and-suspenders kind of manner. *See, e.g.*, Scalia & Garner, *Reading Law* at 176-77 (noting that "[s]ometimes drafters . . . *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach" (emphasis in original)).

¶30    Putting these steps together, then, we conclude that since the CVRs are "forms related to the election" (step 1), and since they're also "election returns and papers produced before the board" (step 2), access is accordingly restricted under the scheme set forth in section 20A-4-202(2) (step 3).

¶31    In opposing such a view, Orten and Anderson rely heavily on GRAMA's overarching statement that a "record is public unless otherwise *expressly provided* by statute." Utah Code § 63G-

2-201(2) (emphasis added). In their view, the statutory analysis we've set forth above is simply not clear enough to qualify.

¶32 We acknowledge the concern, but we disagree with its application here. GRAMA's reference to what's "expressly provided" from some other statute must still be amenable to some form of reasonable interpretation under ordinary principles of statutory construction. For example, this requirement couldn't refer to just the particular label that's attached to a document. After all, GRAMA applies statewide, and yet different entities might have different naming conventions for otherwise similar documents. If GRAMA were narrowed in such a fashion, an entity could avoid release of records simply by renaming an otherwise-covered document and thus frustrate the legislature's purpose to control which records are and are not public.

¶33 It's true that the construction we've set forth above spans several statutes. But the whole-text canon and the cases that have applied it contemplate that legislatures sometimes do speak in such a manner. And here, we regard each of the above steps, as well as the links between those steps, to be clear enough to expressly restrict public access to these documents, particularly when the scheme as a whole is considered. For these reasons, we conclude that the district court did not err in dismissing this portion of the complaint.

*Project Backup Database*

¶34 Orten and Anderson next request what they've referred to as the "Project Backup Database." This database does not appear to be a creature of any statute. And as indicated, Orten and Anderson said in their complaint that this was a "backup of the election project database containing project files from the election management server tabulators and any external drives, such as log files, reports, audio files, and backups of the ballots, etc."

¶35 In its dismissal ruling, the district court appears to have treated this request as being somewhat coterminous with the

requests for the other kinds of records at issue. And in their briefing on appeal, Orten and Anderson did not meaningfully differentiate this request from the others, instead repeatedly asserting that the dismissal of the portion of the complaint relating to the Project Backup Database should be overturned for the same reasons relating to those other requests. After oral argument in this appeal, this court issued a supplemental briefing order asking the parties to address certain legal questions that had come up during deliberations—including, of some note, certain questions relating to the scope of the requested records. In her supplemental brief, the Lieutenant Governor expressed her understanding that the Project Backup Database is a "compressed copy of the complete contents of an election server for a specific election"—i.e., that it's essentially a "read-only" electronic backup of the "ballot images and CVR[s]." In their supplemental brief, Orten and Anderson did not describe it differently.

¶36   Based on that understanding (i.e., that the Project Backup Database is an electronic file that contains a backup of the ballot images and the CVRs), as well as the nature of the arguments presented to us by Orten and Anderson (i.e., that this portion of the dismissal ruling was allegedly infirm for the same reasons Orten and Anderson have given regarding the other kinds of records), we affirm the district court's dismissal for the same reasons given above.[12]

---

12. To be clear, it's at least arguable that the request for a Project Backup Database was intended to be broader than just an electronic database containing a backup of the ballot images and/or the CVRs. But in their briefing on appeal, Orten and Anderson have not meaningfully argued, much less persuaded us, that either (i) there was a material difference between the scope of the so-called Project Backup Database and the ballot images or CVRs discussed above, or (ii) that any such difference should have legally differentiated this request from the others as far as whether the complaint should be dismissed. As a result,

(continued…)

*Tabulator Tapes*

¶37    Finally, Orten and Anderson request access to Tabulator Tapes. We affirm the dismissal of this portion of the complaint as well.

¶38    In the GRAMA requests at issue, Anderson requested "the Tabulator Tapes *produced by* all tabulators used in" certain elections, "including the zero tapes printed prior to the start of the election." (Emphasis added.) Taking these requests at face value, it seems that by "Tabulator Tapes," what Anderson was requesting was something that reported votes—i.e., a document that, to use her words, was "produced by the tabulators." And this is consistent with how Anderson described these requests in her opening brief. There, Anderson argued that she should be able to access "a report or record to tally multiple votes (such as a CVR or tabulator tapes)." And immediately under a subheading titled "What are Tabulator Tapes?", Anderson argued that Tabulator Tapes do not qualify as "ballots" because the term "ballot" "does not include a record to tally multiple votes." In this sense, Anderson has reinforced, in this appeal, that the "Tabulator Tapes" at issue qualified as a "record to tally multiple votes."

¶39    So viewed, we conclude that the district court properly dismissed this portion of the complaint. And we do so for the same reasons set forth above relating to the CVRs. An official "tally" or "record to tally multiple votes" would qualify as a "form[] related to the election" under Utah Code section 20A-4-303(1)(b)(i). As such, it also would be subject to the filing scheme set forth in Utah Code section 20A-4-202. And as explained, that filing scheme provides that such documents are to be sealed,

---

while we affirm this dismissal on the basis set forth above, we leave open the possibility that some future case might proceed differently if it involves some combination of either a differently defined GRAMA request or different arguments presented to the courts.

locked, deposited in a safe and secure place, stored for 22 months, and then destroyed without being opened or examined.

¶40 In response, Anderson argues that her request for Tabulator Tapes was actually broader. She points out that in the complaint, she defined "Tabulator Tapes" as "the means for calculating vote totals," and consistent with this additional definition, the complaint equated Tabulator *Tapes* with Tabulating *Cards*. The reason this potential link might matter has to do with Utah Code section 20A-4-202(3)(a). There, the Election Code sets forth a filing scheme for "all tabulating cards and other materials used in the programing of the automatic tabulating equipment." *Id.* With respect to such materials, section 20A-4-202(3) states that the election officer:

- "shall package and retain" them;

- "*may* access" and "*may* make copies" of them;

- and "within 22 months after the election in which they were used, *may* dispose of those materials or retain them."

*Id*. § 20A-4-202(3)(a), (b)(i), (b)(ii), (b)(iv) (emphases added).

¶41 The use of the permissive "may" in these provisions stands in contrast with the scheme set forth in section 20A-4-202(2) that governs disposition of "ballots" and "election returns." As discussed, that scheme requires the election officer to destroy those documents without ever opening or examining them. But there's no similar "without opening or examining" language governing the disposition of the "tabulating cards and other materials used in the programming of the automatic tabulating equipment." *Id*. § 20A-4-202(3)(a)–(b). Taking all this together, it appears that the Election Code does not restrict public access to Tabulating Cards in the same way that it restricts access to ballots and election returns. Thus, if the request for Tabulator Tapes was really a request for Tabulating Cards, then the court may have erred in dismissing the complaint.

¶42    But we still see no error in the dismissal. What's at issue in this appeal is whether the district court erred in dismissing the complaint. What was at issue in the complaint, however, was whether the Counties had improperly denied the GRAMA requests that were filed by Orten and Anderson. Under Utah Code section 63G-2-201(6)(b), a "governmental entity shall provide a person with a certified copy of a record *if . . .* the person identifies the record with reasonable specificity." (Emphasis added). We applied and enforced this requirement in *Maese v. Davis County*, 2012 UT App 48, 273 P.3d 949. There, Maese requested a property records database or, in the alternative, a "compiled transaction report" for the last 20 years, but the county refused to provide it on the grounds that the underlying records in the database were already freely available through its websites. *Id.* ¶¶ 2, 5 (quotation simplified). In his appeal to this court, Maese argued that the publicly available documents did not satisfy his request as the database he'd requested was "a new and independent public record greater than the sum of its parts because it contain[ed] metadata and other variables." *Id*. ¶ 5 (quotation simplified). But we rejected this argument, in part, because the original GRAMA request itself hadn't been specific enough to alert the county that Maese was requesting metadata. *Id*. ¶¶ 6–7. We explained that where "the face of the GRAMA request" did not "describe the same records" Maese sought on appeal, the district court "was correct not to directly rule on the validity of the [new] legal assertion in [the] complaint," but that it could instead focus on whether the county "sufficiently complied with the GRAMA request Maese actually submitted." *Id*.

¶43    The same is true here too. As explained, Orten and Anderson didn't ask for "Tabulating *Cards*" in their GRAMA requests, nor did they ask for something that could be reasonably construed as "materials used in the *programming* of the automatic tabulating equipment." Utah Code § 20A-4-202(3)(a) (emphases added). Instead, as stressed by the Lieutenant Governor in her brief, "the actual GRAMA requests reference only 'tabulator tapes.'" And again, we further note that these requests clarified that they were seeking tapes that had been "*produced by* all

tabulators used in" certain elections. (Emphasis added.) It was the denial of these requests on these terms that was at issue in the district court proceedings and is now before us on appeal.

¶44    Of some additional note, the district court appears to have recognized this potential issue. At the hearing on the motion to dismiss, the court asked Orten and Anderson's counsel if there was "a difference between a tabulator card and the tabulator tapes that you seek." In response, counsel said: "I don't know the answer to that. That's a factual question. We're going to have to get experts in this case to tell us, are those the same thing?"

¶45    In our view, what's significant about this exchange is that, even when asked, Orten and Anderson's counsel could not definitively assert that the GRAMA requests were broad enough to include Tabulating Cards. In light of this, the district court could hardly be faulted for not concluding that these requests had "identifie[d]" Tabulating Cards "with reasonable specificity." *Id*. § 63G-2-201(6)(b). As a result, we see no basis for holding that the court erred by not allowing the complaint to survive a motion to dismiss on the basis of a request for tabulator cards that Orten and Anderson never made.[13]

---

13. As explained, we see a divergence between how Tabulator Tapes were described in the GRAMA requests and how they were defined in the complaint. For this reason, we've held that the Counties (and by extension the district court) could properly assess these requests on their own original terms. By point of contrast, we see no similar divergence with respect to the other kinds of documents at issue in this appeal. The terms Ballot Images and CVR weren't defined in the GRAMA requests at issue. And while "Project Backup Database" was defined in the related requests, the definition that was given said that the request was for "software data files collected from the election" and a "backup" of "data from the machines." This definition seems consistent (and at a minimum, does not seem inconsistent) with the one used in the complaint and that we assessed above.

CONCLUSION

¶46 For the reasons set forth above, we affirm the district court's dismissal of the petition for judicial review.

———————