2025 UT App 47

# THE UTAH COURT OF APPEALS

JAMES W. LAVENDER, JULIE J. LAVENDER, AND LEIGH MEIER,
Appellants,
*v.*
FCOI PRESERVE, LLC,
Appellee.

Opinion
No. 20230390-CA
Filed April 3, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 110500404

Trent J. Waddoups, Attorney for Appellants

Nicholas J. Reisch, Brian W. Zimmerman, Jacob A.
Green, and Adam D. Wahlquist,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 James Lavender, Julie Lavender, and Leigh Meier (collectively, Lavender) sued Fortress Credit Opportunities I (FCOI), requesting a declaratory judgment that the trust deeds that Lavender had recorded on a property were superior to a trust deed that FCOI had recorded earlier on the same property. FCOI later brought a counterclaim against Lavender alleging slander of title.[1]

---

1. The Lavenders and Meier invested in the properties at issue together, have been represented by the same attorneys (continued…)

¶2      The case was litigated for over a decade before reaching trial, and during that period, the district court decided an array of motions. These included a decision granting FCOI's motion for summary judgment against Lavender on Lavender's declaratory judgment claim, a decision allowing an entity called FCOI Preserve to substitute in for FCOI as the counterclaim plaintiff, and various decisions allowing FCOI Preserve to seek certain kinds of damages. At the close of trial, a jury determined that Lavender was liable for slander of title and awarded damages.

¶3      Lavender now appeals, challenging the district court's decisions regarding these and other motions. For the reasons set forth below, we see no reversible error. We therefore affirm.

BACKGROUND[2]

*Lavender Provides Money to Developer*

¶4      The Preserve is a large residential land development in Park City that includes approximately 1,500 acres of land. When a developer (Developer) set out to develop the Preserve in 2000, he divided and organized it into four sections—Preserve I, II, III,

---

throughout the pendency of this case, and have litigated it together. For ease of reference, we'll refer to the Lavender-side parties as the singular "Lavender" throughout this opinion. And with James Lavender seemingly functioning as the lead (and certainly the first-named) plaintiff, we'll use "singular, masculine pronouns for convenience." *See Bodell Constr. Co. v. First Interstate Fin. LLC*, 2018 UT App 199, ¶ 1 n.1, 437 P.3d 483.

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

and IV. To finance various phases of the Preserve, Developer utilized personal capital, partnership investments, and bank financing.

¶5 In 2004, Lavender purchased a lot in Preserve I for $540,000, and less than a year later, Lavender sold that lot for around $1.1 million. Lavender decided to reinvest those proceeds into the development of Preserve III. Lavender and others ultimately invested $4 million into Preserve III.

¶6 Lavender and Developer agreed that Lavender was contributing this money as an investment. As part of the related transactions, for example, Lavender signed various written agreements that stated Lavender was purchasing "ownership [i]nterest[s]" in the company that had been set up to develop Preserve III. In a similar vein, other documents that Lavender signed stated that he would receive "equity" in the development rights for the properties that were part of Preserve III.

¶7 In late 2005, and in an apparent effort to reduce Lavender's tax burden, Lavender and Developer agreed that at least part of the investment could be retroactively structured as a "1031 exchange."[3] To this end, Developer agreed to provide Lavender with notes and trust deeds for 10 of the 31 properties involved in Preserve III, and these documents represented that at least some portions of the investment were actually loans that would have to be repaid (as opposed to investments made in exchange for equity). But, as was alleged by FCOI in the subsequent litigation,

---

3. As we've recently explained, a 1031 exchange is a type of "real estate transaction in which a taxpayer sells real estate . . . and uses the funds to acquire replacement property," and the "benefit of a 1031 exchange is that it allows the capital gains taxes to be deferred." *Mortensen v. Mortensen*, 2025 UT App 8, ¶ 12 n.4, 564 P.3d 508 (quotation simplified), *petition for cert. filed*, Feb. 24, 2025 (No. 20250197).

Developer did not actually "intend that the trust deeds be recorded," nor did Developer intend for Lavender to ever be considered a lender. Instead, the understanding was that Lavender would still be what he was all along—a *partner* who had purchased an *interest* in the development (as opposed to a lender who had made a loan and would receive his principal plus interest back in return). Thus, FCOI later alleged that the trust deeds and notes that were created in late 2005 were "a subterfuge, only to be used if the IRS came calling." And consistent with this allegation, FCOI later pointed out the trust deeds and notes were not drafted and finalized until more than a month after the transaction—namely, the transaction in which Lavender provided funds to Developer—had closed, those documents set forth no definitive date for repayment (which, FCOI alleged, would be an oddity if Lavender had originally intended for them to be collectible), and were not recorded until nearly two years after the transaction.[4]

*After Fortress Loans Money to Developer, Lavender Records His Trust Deeds*

¶8    In early 2007, the Preserve's original lender advised Developer that it would not renew its development loan on the Preserve. Developer accordingly approached Fortress Investment Corp., a New York private equity fund, which agreed to refinance the development of the Preserve (thereby satisfying the original loan and making Fortress Credit Corp. (Fortress) the lender on the project). As conditions of its agreement, Fortress obtained "a first lien position" and an agreement that it would receive payment of "100% of net sales proceeds until its loan was fully repaid." On August 10, 2007, Lavender quitclaimed his interest in the Preserve III property to an entity called the Preserve Development (a

---

4. As further explained below, *infra* ¶ 35, the district court later concluded that the jury's verdict implicitly (if not explicitly) accepted this view regarding the true nature of these documents.

master partnership which seems to have been controlled by or affiliated with Developer) so that title to the property vested in the Preserve Development alone. On August 13, 2007, Fortress funded a $25,580,000 loan to the Preserve Development.

¶9 Fortress's loan was secured by a construction trust deed. This construction trust deed was recorded on August 14, 2007.

¶10 On September 19, 2007, after Fortress completed its loan and recorded its trust deed, Lavender recorded the trust deeds that he had previously obtained from Developer. Lavender's trust deeds directly encumbered only 10 of the 31 lots in Preserve III. Fortress had been previously unaware that these trust deeds existed.

*Fortress's Pattern of Intracorporate Assignments*

¶11 In the ensuing years, Fortress's trust deed exchanged hands several times. As will be discussed in more detail below, these assignments ultimately drove much of the ensuing litigation. For the reader's convenience, we'll recount all the various assignments together here.

- On August 13, 2007, the same day the loan funded, Fortress assigned the trust deed to Drawbridge Special Opportunities Fund LP (Drawbridge).

- A little over a month later, Drawbridge assigned that trust deed to FCOI.

- FCOI retained the trust deed for the next several years. In May 2011, FCOI obtained title to the lots in Preserve III after foreclosing on the Fortress loan (an event that we'll describe shortly).

- In early 2015, FCOI created FCOI Preserve as an entity that would hold and then sell the properties that FCOI had now

obtained. In March 2015, FCOI assigned the trust deed to FCOI Preserve.

Of note, no consideration was exchanged for any of these transfers, and a Fortress employee later described them in a sworn statement as "intracompany transfers" "from one Fortress controlled entity to another."

*After FCOI Forecloses on Its Loan, Lavender Asserts Priority over Fortress*

¶12    In May 2011, Developer defaulted on its loan obligations to Fortress. At that time, Fortress's original trust deed on the properties was assigned to FCOI. Pursuant to its rights under the trust deed, FCOI initiated foreclosure proceedings.

¶13    After Lavender learned of the pending foreclosure action, his counsel sent a demand letter to Fortress claiming that Lavender had a security interest in the Preserve property. In support, he pointed to the trust deeds that Lavender had obtained from Developer (which, again, he had belatedly recorded *after* Fortress had recorded its own trust deed on the same properties). Relying on his own trust deed, Lavender now insisted that Fortress was on inquiry notice of his interest in the properties and that he had "a first priority lien" that would not be "terminate[d]" by Fortress's foreclosure.

*Lavender's Complaint and FCOI's Counterclaims*

¶14    In May 2011, Lavender sued Fortress, requesting a declaratory judgment that his trust deeds were superior to the interests claimed by Fortress, and he filed notices of lis pendens with the county recorder. Later that year, Lavender filed an amended complaint that now listed Drawbridge as the defendant (given that, at the time, it was Drawbridge that held the trust deed). In this amended complaint, Lavender affirmatively agreed that Fortress had "assigned its interest" in its trust deed to

Drawbridge and that Drawbridge was "a subsidiary of Fortress." A month after filing the amended complaint, Lavender filed a second amended complaint that listed FCOI as the defendant, asserting that Drawbridge had assigned its interest to FCOI and that FCOI was a "subsidiar[y] of Fortress."

¶15    In 2014, FCOI filed counterclaims against Lavender, alleging slander of title and intentional interference with economic relations. With respect to the slander of title claim, FCOI asserted that by "improperly recording" his trust deeds, Lavender "published a slanderous and disparaging statement," that the trust deeds were "false and of no value," that this was done "to impair [FCOI's] property rights," and that Lavender "knew or should have reasonably foreseen might result in damage to" FCOI. With respect to the intentional interference with economic relations claim, FCOI asserted that Lavender "intentionally interfered with [FCOI's] ability to market and [sell] its property" with "an improper purpose or by improper means," which caused "damage[s]" and "irreparable harm" to FCOI. FCOI sought "actual or special damages" for "[un]complete[d] land sales," as well as "an order for temporary, preliminary, and permanent injunctive relief."

*Relevant Pretrial Motions*

¶16    The case was then litigated for many years. During that time, the court ruled on a number of motions. The motions relevant to the issues that we decide in this appeal include the following.

¶17    In July 2017, FCOI filed a motion for summary judgment on Lavender's declaratory judgment claim, asserting that its trust deed had priority over Lavender's because FCOI was "a bona fide purchaser for value" under the Utah Recording Act. Lavender opposed the motion, arguing that "a legitimate question of fact exist[ed] whether [FCOI] was a bona fide purchaser without constructive notice." The district court granted FCOI's motion,

ruling that "Fortress was a bona fide purchaser for value and its trust deed[] ha[s] priority over [Lavender's] trust deeds." The court accordingly dismissed Lavender's declaratory judgment claim.

¶18 In November 2019, while litigation on FCOI's counterclaims was still underway, FCOI filed a motion under rules 17 and 25 of the Utah Rules of Civil Procedure, requesting leave to substitute FCOI Preserve as "the proper real party in interest to pursue the [counterclaims] against Lavender." In support of this motion, FCOI attached a sworn declaration from a Fortress employee explaining that, in accordance with FCOI's "general practices," FCOI had deeded the properties to FCOI Preserve in 2015, so "[a]ll sales of the properties in [t]he Preserve . . . were made in the name of FCOI Preserve."[5]

¶19 Lavender opposed the motion to substitute, arguing that "Fortress is judicially estopped from seeking substitution because it has previously requested and received judicial relief base[d] on its representation that Fortress is the actual party in interest." Notably, Lavender did not also argue that substitution would be improper under the terms of rules 17 or 25 themselves. The district court granted FCOI's motion to substitute, holding "that the Motion and supporting declaration of [Fortress's employee] provide sufficient support to grant the relief requested." In its order, the court explicitly noted that FCOI sought substitution "under Rules 25 and 17 of the Utah Rules of Civil Procedure."

¶20 In March 2020, with the assistance of new counsel, Lavender filed a motion for summary judgment on the counterclaims, arguing that FCOI Preserve lacked standing and that the district court therefore lacked jurisdiction. In Lavender's

---

5. The record indicates that by March 2017, all 31 lots in Preserve III, including both the 10 lots encumbered by Lavender and the 21 other lots too, had been sold.

view, FCOI Preserve couldn't show injury, causation, or redressability, because, at the time that Lavender's trust deeds were recorded (which, again, was the impetus for FCOI's slander of title counterclaim), it was Drawbridge, not FCOI Preserve, that owned the lots in Preserve III. In other words, Lavender asserted that the only entity that had standing to pursue either of the claims at issue in the counterclaim was the entity that owned the lots at the time that Lavender recorded his trust deeds.

¶21 The district court denied the request for summary judgment as to the slander of title claim. In the district court's view, FCOI Preserve had "alleged damages and has standing to pursue its slander of title claim" because the cause of action was available "to property owners categorically rather than to a specific property owner." But the district court granted Lavender's request for summary judgment on the intentional interference with economic relations claim, concluding that this claim "require[s] a showing of intent to harm by the offending party, and the intent to harm must be specific to the party asserting the claim." The district court concluded that Lavender could not have intended to harm FCOI Preserve "because it did not yet exist at the time the trust deeds were filed."

¶22 In March 2020, Lavender also filed a motion pursuant to rule 54(b), asking the court to set aside its earlier ruling granting FCOI's motion for summary judgment on the declaratory judgment claim. In this motion, Lavender argued, in relevant part, that neither Fortress nor FCOI Preserve qualified as bona fide purchasers. The district court denied the rule 54(b) motion on several grounds, including that Lavender had identified no "clear error of law" and that any entity that acquired title through Fortress (which was, as the court had previously ruled, a bona fide purchaser for value) was likewise protected under what the court referred to as "the shelter rule."

¶23    As the case got closer to trial, Lavender filed various motions in limine. In one of them, Lavender asked the court to exclude evidence of what Lavender referred to as "stigma" damages to 21 lots that were within Preserve III but were not encumbered by Lavender's trust deeds. The district court denied this motion, ruling that the Utah Code places a "narrow definition" on the term "stigma" which "does not include clouds on title."

¶24    In another motion in limine, Lavender asked the court to rule that his act of recording his trust deeds was protected by both an absolute privilege (namely, the judicial proceeding privilege) and a conditional privilege (namely, what Lavender referred to as the "rival claimant" privilege). The district court denied this motion, ruling, in part, that since "a finding of malice would vitiate any conditional privilege defense that might apply," "no separate instruction regarding conditional privilege is necessary."

¶25    In July 2020, Lavender filed another motion for summary judgment on FCOI Preserve's slander of title claim, this time arguing that the claim was time barred under "the applicable statute of limitations." In Lavender's view, the cause of action accrued on the date on which the property in question was sold—which was September 21, 2007 (i.e., the day that Drawbridge assigned its interest to FCOI). Lavender then identified two different statutes of limitation that "might, arguably, apply"—a one-year limitation under Utah Code section 78B-2-302(4) and a three-year limitation under Utah Code section 78B-2-305(1). Lavender thus argued that, because FCOI did not file its counterclaim until January 24, 2014, the counterclaim was untimely under either statute of limitations, and Lavender further argued that the counterclaim did not "relate back to the date the complaint was filed."

¶26    The district court denied the motion. In the court's view, the three-year statute of limitations applied. From this, the court

then ruled that since "FCOI presented evidence that the first sale by FCOI that caused special damages to FCOI occurred in 2012," and since "FCOI asserted its counterclaim in early 2014," the motion should be denied.

¶27　In May 2021, Lavender filed a motion to dismiss the slander of title claim, asserting that because FCOI Preserve was a "subsequent purchaser" of the property, Lavender "owed no duty" to FCOI Preserve and the slander of title claim failed "as a matter of law." The district court denied the motion, ruling that Lavender's argument was "incorrect under Utah law."

¶28　In the same ruling, the district court indicated that although Lavender's arguments were "not entirely clear from the initial motion," it understood—through a combination of arguments made in Lavender's reply memorandum and at oral argument—that Lavender was also arguing that FCOI Preserve's slander of title claim should be dismissed because it "lacks evidence of special damages or failed to disclose evidence of special damages." The district court denied the apparent request for dismissal on this additional ground as well, concluding that it "previously ruled that such evidence was sufficient to proceed to trial and was sufficiently and timely disclosed."

¶29　In February 2022, Lavender filed another motion to dismiss, this time arguing that the counterclaim failed to comply with the specificity requirements for pleading special damages set forth in rule 9 of the Utah Rules of Civil Procedure. Lavender additionally argued that FCOI Preserve should be limited to the damages pleaded in the 2014 counterclaim—which, again, had initially been based on uncompleted sales (as opposed to reduced sale prices). FCOI Preserve opposed the motion, contending that it had properly pleaded special damages, and alternatively, requesting leave to amend its counterclaim. The district court denied Lavender's motion to dismiss and granted FCOI Preserve leave to file an amended counterclaim. The court found "that the

amendment is justified by a good faith effort to have the operative pleading match the damages model that has been disclosed and litigated in this case for years." And it found that such amendment would "not cause any unfair prejudice to" Lavender.

¶30 FCOI Preserve accordingly filed an amended counterclaim in March 2022. The amended counterclaim stated the same claim for relief for slander of title that had originally been pleaded. The amended counterclaim clarified that FCOI Preserve had "incurred actual or special damages in the form of reduced sales prices for lots as a result of the clouds on title created by" the filing of Lavender's trust deeds. It specifically listed the parcel designations of 31 lots "which suffered reduced sales prices," and alleged that FCOI Preserve "incurred $3,941,760 in damages due to the diminished . . . marketability and value of its encumbered properties and neighboring properties."[6]

¶31 In September 2022, Lavender filed yet another motion for summary judgment, now arguing that the cause of action for slander of title asserted in FCOI Preserve's amended counterclaim was "barred by the applicable statute of limitations." Lavender claimed that the "cause[] of action accrued no later than 2017" (the date that the last Preserve property was sold), and that the "3-year time limit of § 78B-2-305(1) ran no later than 2020." Lavender then argued that the "new cause[] of action" in the amended counterclaim could not relate back to the cause of action asserted in the original counterclaim because this cause of action asserted, "for the first time, allegations about injuries purportedly suffered by [FCOI Preserve] in its own behalf." The district court later

_____

6. The amended counterclaim also re-pleaded the cause of action for intentional interference with economic relations, even though the court had previously granted summary judgment as to that cause of action. That cause of action was not submitted to the jury, however, and the parties have raised no arguments on appeal relating to it.

denied the motion, holding "as a matter of law that [FCOI Preserve's] amended counterclaim which asserts a single cause of action for slander of title relates back to the date of filing of [its] original counterclaim under Rule 15(c)(2) as interpreted and applied and explained in" *Noor v. State*, 2019 UT 3, ¶ 47, 435 P.3d 221.

*Trial and Verdict*

¶32   The case proceeded to a four-day jury trial in November 2022.

¶33   At the close of FCOI's case, Lavender filed a motion for directed verdict. There, Lavender asked the district court to dismiss FCOI Preserve's claim for slander of title because "no evidence exist[ed] to support" the claim and "no reasonable mind could differ on the facts." Lavender argued that there was "no evidence that the Trust Deeds are false" and no evidence demonstrating "malice in the filing of the Trust Deeds." And with respect to the 21 unencumbered lots, Lavender further argued that there was "no specific monetary loss or special damages, only general damages," which Lavender understood to be "stigma damages" in this case. The court deferred ruling on the motion until FCOI Preserve had a chance to respond. The court later denied the motion.

¶34   After the case closed and was submitted, the jury returned a verdict in FCOI Preserve's favor on its slander of title claim. Through a special verdict form, the jury then awarded damages on a lot-by-lot basis—including damages based on the 21 unencumbered lots. In total, the jury awarded FCOI Preserve $1,416,730 in damages. The district court later issued a final

judgment that awarded an additional $677,419.90 in prejudgment interest.[7]

¶35   A month after trial, Lavender filed a motion for judgment as a matter of law. Lavender argued that the jury's verdict on the slander of title claim should be vacated because "no evidence exist[ed] to support" the claim and "no reasonable mind could differ on the facts." The district court denied the motion, ruling that there was evidence from which the jury could find in favor of FCOI Preserve on all four elements of the claim. Specifically, the court pointed to evidence that Lavender recorded trust deeds against 10 of FCOI Preserve's lots, "evidence from which [the jury] could draw a reasonable inference that the trust deeds were part of a sham loan transaction," evidence "demonstrating that Lavender . . . knew the trust deeds and associated loans were not real transactions," and "evidence from which a reasonable jury could find that FCOI [Preserve] suffered special damages in the form of reduced sales proceeds."

## ISSUES AND STANDARDS OF REVIEW

¶36   On appeal, Lavender first claims that the district court erred when it granted FCOI's motion to substitute FCOI Preserve as the counterclaim plaintiff. "A district court's substitution ruling is a discretionary one that we review for an abuse of

---

7. As noted above, Leigh Meier was a named defendant in the counterclaim. In its verdict, the jury apportioned fault equally between the Lavenders and Meier. As a result, in the final judgment, the district court ordered (1) the Lavenders and (2) Meier to each pay $708,365 relating to the jury's verdict on the slander of title claim and $338,709.95 relating to the award of prejudgment interest. Again, the Lavenders and Meier have proceeded together, and the apportionment of fault between them has no bearing on any of the issues raised on appeal.

discretion." *Bradburn v. Alarm Prot. Tech., LLC,* 2019 UT 33, ¶ 8, 449 P.3d 20.

¶37 Second, Lavender challenges the district court's denial of the motion to dismiss that he filed in May 2021. "Because a trial court's grant or denial of a motion to dismiss is a question of law, the standard of review is correctness. This standard of review grants no deference to the decision of the district court." *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, ¶ 21, 545 P.3d 781 (quotation simplified).

¶38 Third, Lavender claims that the district court erred in ruling that FCOI Preserve qualified for protection as a bona fide purchaser under the shelter rule. The district court made this ruling when it denied Lavender's rule 54(b) motion, which asked the court to set aside an earlier ruling granting FCOI's motion for summary judgment. "We review a district court's refusal to reconsider a nonfinal summary judgment order only for an abuse of discretion." *Chilton v. Young*, 2009 UT App 265, ¶ 4, 220 P.3d 171; *see also IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588 ("[R]econsideration of an issue before a final judgment is within the sound discretion of the district court.").

¶39 Fourth, Lavender claims that the district court erred in ruling that FCOI Preserve's "amended counterclaim related back to [the] original counterclaim filed by" FCOI as part of its ruling on the statute of limitations issue. When a district court determines that a claim relates back under rule 15, we review that determination for correctness. *See Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶¶ 29–31, 101 P.3d 371.

¶40 Fifth, Lavender argues that the district court erred in ruling that two privileges (the absolute judicial proceeding privilege and the conditional rival claimant's privilege) did not apply. "The existence of a privilege is a question of law for the court, which we review for correctness, giving no deference to the trial court's determination." *Price v. Armour*, 949 P.2d 1251, 1254 (Utah 1997).

As to conditional privileges in particular, the question of "whether a publication is conditionally privileged is a question of law, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice." *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 53, 116 P.3d 271 (quotation simplified); *see also O'Connor v. Burningham*, 2007 UT 58, ¶ 38, 165 P.3d 1214 ("Whether a statement is entitled to the protection of a conditional privilege presents a question of law; whether the holder of the privilege lost it due to abuse presents a question of fact.").

¶41    Sixth, Lavender makes two claims related to damages. Lavender initially claims that FCOI Preserve failed to sufficiently plead or prove special damages. As explained below, Lavender has not sufficiently identified the ruling that he's now appealing, so it's unclear what standard of review should apply. As a result, we ultimately disregard this damages claim for inadequate briefing. Lavender also claims that the district court erred in allowing FCOI Preserve to recover damages "as to the 21 stigma lots." We understand this to be a challenge to both the denial of the stigma-related motion in limine, as well as the denial of Lavender's mid-trial motion for a directed verdict. With respect to the motion in limine, Lavender's argument is legal in nature, so the court's ruling is reviewed for correctness. *See In re Estate of Osguthorpe*, 2021 UT 23, ¶ 58, 491 P.3d 894. With respect to the denial of his motion for a directed verdict, we consider whether, examining all evidence in a light most favorable to the non-moving party, there was any competent evidence that would support a verdict in the non-moving party's favor. *See Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467.

¶42    Finally, Lavender claims that the district court erred in awarding prejudgment interest to FCOI Preserve. "A trial court's decision to award prejudgment interest presents a question of law which we review for correctness." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263 (quotation simplified).

ANALYSIS

I. Motion to Substitute

¶43    At the broadest level, this litigation started with a dispute about who had the superior security interest in certain Preserve III properties. On one side of the dispute was Lavender. But identifying the other side of the dispute was a little more complicated. As detailed above, Fortress loaned money to Developer and obtained a trust deed. Then, in a series of what it later alleged were "intracompany transfers," that trust deed went from Fortress to Drawbridge in August 2007, from Drawbridge to FCOI in September 2007, and from FCOI to FCOI Preserve in March 2015.[8]

¶44    This series of assignments impacted this litigation in numerous ways—including, of note here, the question of who the Fortress-side party was at various stages of the case. As noted, Lavender initially sued Fortress, only to then amend his complaint to list Drawbridge as the defendant, only to then amend his complaint again to list FCOI as the defendant. For its part, it was FCOI that filed the counterclaim against Lavender, but after FCOI assigned its interest in its trust deed to FCOI Preserve, FCOI filed a motion to amend, seeking to substitute FCOI Preserve in as "the proper real party in interest to pursue the [counterclaims] against Lavender" under rules 17 and 25 of the Utah Rules of Civil Procedure. Lavender opposed the substitution motion, but the district court granted it, holding "that the Motion

---

8. FCOI's assertion that these were "intracompany transfers" is consistent with how Lavender has approached the case too. In his amended complaint, Lavender asserted that Fortress had "assigned its interest" in its trust deed to Drawbridge and that Drawbridge was "a subsidiary of Fortress," and in his second amended complaint, he asserted that Drawbridge had assigned its interest to FCOI and that FCOI was a "subsidiar[y] of Fortress."

and supporting declaration of [Fortress's employee] provide sufficient support to grant the relief requested." In its order, the court explicitly noted that FCOI sought substitution "under Rules 25 and 17 of the Utah Rules of Civil Procedure."

¶45    Lavender now challenges that decision on appeal. In his opening brief, Lavender argued that substitution was improper under the terms of rule 25 because "the trial court received no evidence of a 'transfer of interest' as required by" that rule. Then, in his reply brief, Lavender further argued that rule 17 did not apply because that rule "relates to matters occurring prior to filing of an action."[9]

¶46    But we decline to address Lavender's assertions because they were not preserved below. Under our preservation rules, if a party "fail[s] to raise an issue at the appropriate time," the party "risk[s] losing the opportunity to have the court address that issue." *Hillam v. Hillam*, 2024 UT App 102, ¶ 30, 554 P.3d 1137 (quotation simplified). An issue is properly preserved "when it has been presented to the district court in such a way that the court ha[d] an opportunity to rule on it"—i.e., "the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified). By contrast, a party is allowed to

---

9. With respect to rule 17, he more particularly argued that this rule "has no application to the facts of this case" because it "relates to matters occurring prior to filing of an action" and FCOI Preserve did not have an interest in the properties (or even exist) in 2014 when the original counterclaim was filed. And with respect to rule 25, he argued that "[o]ne seeking substitution must demonstrate that the 'action' was transferred from the original party to the party that wants to take its place under [rule] 25(c)" and that FCOI Preserve had presented no evidence of such a transfer.

present "new arguments" on appeal, even if those arguments were not advanced below. *Id.* (quotation simplified).

¶47 The distinction between issues and arguments turns on what, exactly, is being presented. When a party advances "an entirely distinct legal theory," our appellate courts treat that theory as a new issue. *Id.* (quotation simplified). And our appellate courts will "reject as unpreserved a legal theory entirely distinct from the legal theory the appellant raised to the district court." *Wittingham, LLC v. TNE Ltd. P'ship*, 2024 UT 23, ¶ 53, 554 P.3d 924 (quotation simplified). But if a party instead simply provides "new authority or cases supporting an issue," that constitutes a new argument, and new arguments are not subject to the preservation rule. *Id.* (quotation simplified).[10]

---

10. The preservation rule is not an exercise in formalistic box-checking. To the contrary, it promotes judicial economy by ensuring that the district court is given the "opportunity to address the claimed error, and if appropriate, correct it," thereby "avoid[ing] unnecessary appeals and retrials." *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828 (quotation simplified). For somewhat similar reasons, it also promotes fairness between the parties. After all, "if no objection was made in the trial court, the adverse party would not be compelled to overcome the objection by presenting a rebuttal, providing an alternative argument, establishing an alternative defense, or introducing new evidence in an effort to overcome such an objection." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 32, 507 P.3d 357 (quotation simplified). And even if a party had no valid defense to that issue, the party would then in theory have been presented with entirely different sets of litigation choices and incentives. By waiting until an appeal to raise an issue, an appellant thus deprives the appellee of making informed choices with the benefit of the district court's ruling.

(continued…)

¶48    Here, Lavender advances fairly intricate arguments about why, in his view, substitution was improper under both rule 17 and rule 25. These arguments depend not only on the language of those rules, but also on a particular distinction drawn by our supreme court in *Trapnell & Associates, LLC v. Legacy Resorts, LLC*, 2020 UT 44, 469 P.3d 989.

¶49    But when Lavender opposed the substitution motion below, he didn't cite either rule, much less claim, as he does on appeal, that this requested substitution would violate the requirements of these rules. Instead, he opposed the request solely on judicial estoppel grounds. Judicial estoppel doesn't find its footing in rule 17 or rule 25, however, but is instead a common law doctrine under which "a person may not, to the prejudice of another person, deny any position taken in a prior judicial proceeding between the same persons or their privies involving the same subject matter, if such prior position was successfully maintained." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 42, 207 P.3d 1235 (quotation simplified).

¶50    "Although formal citation to a particular statute"—or, in this case, a particular rule—"might not always be required to preserve an issue, it would be the usual and presumptive starting place if an assertion is predicated on" that rule. *Hillam*, 2024 UT

---

Here, because Lavender did not present his claims relating to the alleged inapplicability of rules 17 and 25 below, the district court had no opportunity to make any necessary findings or rulings relating to the applicability or inapplicability of those rules. And if it were true that FCOI Preserve somehow had no meritorious response to these new assertions (a point that, to be clear, we do not decide), FCOI Preserve would have then needed to adjust its litigation posture to account for that new reality. It would therefore be unfair to FCOI Preserve for this substitution ruling to be reversed on appeal based on new issues that Lavender could have asserted much earlier in this case.

App 102, ¶ 37. "Without such a citation," the party "would have at least been required to present this distinct legal theory to the district court in such a way that the court had an opportunity to rule on it." *Id.* (quotation simplified). Here, there is ample conceptual daylight between an assertion that the requirements of rules 17 and 25 were not satisfied (which is what Lavender asserts on appeal) and an assertion that the other party should be judicially estopped from being allowed to substitute (which is what Lavender asserted below). These assertions are derived from different sources of authority, turn on different legal principles, and ask the courts to answer entirely different questions.

¶51 For the sake of precedential clarity, we acknowledge that in FCOI's motion to substitute, FCOI argued that substitution was proper "under Rules 25 and 17 of the Utah Rules of Civil Procedure." And we also acknowledge that when the district court granted that motion, it referenced both rules. And we further recognize that in some cases, even if a party didn't preserve an issue, an appellate court may consider the issue if the district court "directly addressed" or chose to "[take] up the question" in its ruling. *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 20 n.5, 379 P.3d 1218.

¶52 But this branch of the preservation rule doesn't automatically apply whenever a court simply references a rule in its decision. Instead, as we've recently recognized, there's some complexity to it, and an appellate court may decline to apply it when doing so would not advance the "prudential considerations behind the preservation rule." *Abu-Ulba v. Ananda Sci., Inc.*, 2024 UT App 64, ¶¶ 37–38, 550 P.3d 480, *cert. granted*, 561 P.3d 688 (Utah 2024); *see also Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828. Here, Lavender did not even ask us to reach his assertions about rule 17 and rule 25 under this branch of the preservation rule, much less adequately brief how or why it applies. Because Lavender didn't invoke or brief it, FCOI Preserve

had no occasion to respond on appeal with any argument about why it didn't apply. Without any meaningful discussion of this, we have no basis to consider whether it applies here.

¶53 In short, we agree with FCOI Preserve that the issues raised by Lavender on appeal relating to the substitution motion were not preserved below. As a result, we do not address them further.[11]

---

11. In his opening brief, Lavender also asserted that FCOI Preserve "lacked standing" to proceed below. In Lavender's view, because FCOI Preserve was improperly substituted into the case, it was never a proper party, and because it was never a proper party, it lacked standing to proceed. But we've now rejected Lavender's challenge to the court's substitution ruling. To the extent that Lavender's standing argument turns on that same argument, we reject it too.

We also note that standing is typically assessed under a three-part test. *See Utah Chapter of Sierra Club v. Utah Air Quality Board*, 2006 UT 74, ¶ 19, 148 P.3d 960. While Lavender did make arguments below about FCOI's alleged lack of standing under this test, he did not make any such arguments on appeal. Indeed, in his briefing, he didn't cite any case invoking that standard at all. We recognize, as we have before, that we have an "independent obligation to ensure that we have jurisdiction over all matters before us." *11500 Space Center LLC v. Private Cap. Group, Inc.*, 2022 UT App 92, ¶ 34, 516 P.3d 750 (quotation simplified). But it's unclear whether this obligation requires an appellate court to manufacture and then affirmatively respond to any and all potential arguments about jurisdictional concepts such as standing, including those that the parties themselves have apparently chosen not to advance on appeal. Regardless, we have reviewed the record and have assured ourselves that, as the

(continued…)

## II. Motion to Dismiss

¶54 Lavender next argues that FCOI Preserve could not legally bring a slander of title claim. Lavender points out that FCOI Preserve didn't own the properties in question (or, indeed, even exist as an entity) at the time of the allegedly slanderous statements. Because of this, Lavender claims that he "owed no duty" to FCOI Preserve and that its slander of title claim failed as a matter of law.

¶55 As an initial matter, we note that, in his opening brief, Lavender did not specifically identify the ruling that he's challenging. That said, in various places in his opening brief, Lavender made several references to the district court's failure to "dismiss" the counterclaim. Drawing on this, FCOI Preserve expressed its understanding in its responsive brief that this argument related to the district court's denial of Lavender's motion to dismiss. And this seems to be how Lavender viewed it too. In his reply brief, Lavender asserted that, because FCOI Preserve was a subsequent purchaser, it "had no cause of action," which seems to be a reference to a motion to dismiss. Moreover, we note that this same argument was central to a motion to dismiss that Lavender filed in May 2021, where Lavender asserted that because FCOI Preserve was a "subsequent purchaser" of the property, Lavender "owed no duty" to FCOI Preserve and that the slander of title claim therefore failed "as a matter of law." In

---

properly substituted counterclaim plaintiff, FCOI Preserve had standing to proceed below—and, by extension, on appeal as well.

Finally, in a footnote in his opening brief, Lavender suggests in passing that the case is moot. But his briefing on this point is inadequate—among others, he cites no cases setting forth the mootness doctrine, nor does he develop any argument that fleshes out how, exactly, this case is now moot. On the arguments presented to us and our review of the record, we see no basis for concluding that this case is moot.

light of all this, like FCOI Preserve, we understand Lavender to be challenging the court's denial of the motion to dismiss that Lavender filed in May 2021 (which was after the district court had granted the motion to substitute). On that understanding, we reject Lavender's assertion.

¶56 A rule 12(b)(6) motion turns on whether the complaint (or, as here, a counterclaim) stated a claim upon which relief could be granted. *See* Utah R. Civ. P. 12(b)(6). Such a motion "should be granted only if, assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, ¶ 22, 545 P.3d 781 (quotation simplified). A district court's "denial of a motion to dismiss" presents "a question of law." *Id.* ¶ 21 (quotation simplified).

¶57 Under Utah law, "to prove slander of title, a claimant must prove that (1) there was a publication of a slanderous statement disparaging claimant's title, (2) the statement was false, (3) the statement was made with malice, and (4) the statement caused actual or special damages." *Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 36, 326 P.3d 656 (quotation simplified). When drawing all reasonable assumptions and viewing the facts in the light most favorable to FCOI Preserve, we agree with the district court that the counterclaim stated a claim on which relief could be granted for slander of title.[12]

---

12. In setting forth the elements of a slander of title claim in the briefing, FCOI Preserve pointed us to *Neff v. Neff*, 2011 UT 6, 247 P.3d 380. There, our supreme court stated that a "claim for slander of title requires proof of four elements: (1) publication of a slanderous statement, (2) the statement must be false, (3) the statement must be made with malice, and (4) the statement must

(continued…)

¶58 At the time that Lavender filed the motion to dismiss, the operative pleading was the counterclaim that FCOI had filed in 2014. That counterclaim alleged, among others, the following:

- In August 2007, Fortress had "funded a $25,580,000 loan to the Preserve, subject to a first lien position on all of the unsold . . . Preserve land."

---

cause special damages to the plaintiff." *Id.* ¶ 79. Since Lavender's claim on appeal turns on whether a subsequent purchaser can pursue a slander of title claim, we note that, at first blush, there may seem to be a potentially significant difference between *Neff* and *Dillon* in terms of how the first element is phrased. After all, under the *Dillon* formulation we cited above, the first element turns on whether there was a publication of a slanderous statement "disparaging claimant's title," while the *Neff* formulation simply speaks of a "slanderous statement" without the ownership-based modifier.

That said, *Neff* phrases the fourth element as requiring proof of damages "to the plaintiff," which, conceivably accounts for the difference by requiring proof that the slanderous statement damaged this particular plaintiff. In this sense, the differences between the two formulations could be seen as a matter of phrasing and sequencing. But more importantly, if there is a meaningful legal difference between the two formulations, neither party has briefed the question of what, exactly, it might be or how it would impact this case.

Regardless, the version set forth in *Dillon* seems more favorable to the arguments advanced by Lavender on appeal. But for the reasons set forth in this part of the opinion, Lavender's claim still fails even under that version of the elements of this cause of action. As a result, given the state of this record and the arguments made in the briefing, we see no basis for deciding whether *Dillon* and *Neff* are at odds with each other, given that any such difference would not change our resolution of this case.

- That same month, a title company recorded Fortress's "Construction Trust Deed."

- In September 2007, "after Fortress's Trust Deed" was recorded, Lavender "recorded the Trust Deeds that [he] had previously been given."

- At the time Lavender's "Trust Deeds were recorded, they were false and of no value."

- "Upon information and belief, they were recorded solely to impair [FCOI's] property rights."

- "[Lavender] knowingly and wrongfully recorded and maintained the Trust Deeds under circumstances" where he "knew or should have reasonably foreseen might result in damage to [FCOI]."

- "As a result of the false statement published by [Lavender], [FCOI] has incurred actual or special damages, including attorney's fees incurred in prosecuting this action."

- "As a result of the recording of the Trust Deeds, [FCOI] has been unable to complete land sales which were anticipated and has suffered damages as a result."

¶59 When these allegations are viewed as true and in the light most favorable to FCOI, they were enough to satisfy the elements of this tort. After all, these allegations alleged publication of a false and slanderous statement that disparaged FCOI's title, that the statement was made with the requisite mental state, and that it resulted in damages.

¶60 The fact that FCOI Preserve didn't own the property at the time of the slanderous statement wouldn't change this, at least not for purposes of a motion to dismiss, and particularly not under the circumstances at issue here. As discussed above, by the time

that Lavender filed this motion to dismiss, the district court had already granted the motion to substitute. That motion was supported, in part, by a sworn statement from a Fortress employee averring that FCOI had deeded the properties to FCOI Preserve in 2015, and that as a result of that transaction, "[a]ll sales of the properties in [t]he Preserve . . . were made in the name of FCOI Preserve." And this chain was likewise reflected in Lavender's own pleadings, with Lavender asserting in his amended and second amended complaints that Fortress's interest in the properties had been "assigned" to Drawbridge and then to FCOI, with both of these entities, according to Lavender, being "subsidiaries of Fortress."

¶61 In light of all this, if it were true that by recording the trust deeds in September 2007, Lavender had knowingly filed a false and slanderous statement that disparaged the title owned by Fortress, thereby damaging it, then because FCOI Preserve now owned that same title, FCOI Preserve could in theory prove that this same title (and, thus, its own interests) had been damaged.

¶62 Lavender has pointed to no case in which an appellate court held that as a matter of law, a subsequent owner cannot pursue a slander of title claim if the slanderous statement occurred before the owner obtained title to the property. Nevertheless, even without any on-point authority, Lavender offers three reasons why, in his view, we should now hold that, as a matter of law, a subsequent owner cannot pursue such a claim.

¶63 First, Lavender repeatedly claims that he had no "duty" to FCOI Preserve, given that FCOI Preserve did not own the properties at the time of the slanderous statement. In support of this argument, Lavender points to our supreme court's decision in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228. But *Jeffs* involved a negligence claim. *Id.* ¶ 3. Duty is, of course, an element of a negligence claim. But it's not an element of a slander of title claim under the tests set forth in *Dillon* or *Neff* or any controlling

Utah case. Instead, as discussed, those cases explain that this tort requires proof that the defendant acted with "malice" when making a false statement that damaged the plaintiff's title.

¶64 Second, Lavender asks us to incorporate the elements of Colorado's product disparagement claim as outlined in *Teilhaber Manufacturing Co. v. Unarco Materials Storage*, 791 P.2d 1164, 1166 (Colo. App. 1989). But product disparagement and slander of title are different causes of action with different elements. Lavender has not persuaded us that we should add the elements of a different cause of action (as conceptualized by a different jurisdiction, no less) to Utah's slander of title claim, particularly where our supreme court has already set forth the elements of slander of title in several opinions.

¶65 Finally, Lavender appeals to policy. In his view, it would be unfair to allow a subsequent owner to pursue a slander of title claim, given the possibility that the owner might have obtained the property with the benefit of a reduced sales price as a result of the very slander of title in question. While we recognize the possibility that, in some circumstances, this might be the case, this would in theory impair a subsequent purchaser's ability to prove *damages*. But as indicated, the record here belies the suggestion that FCOI Preserve was a purchaser—instead, it appears to have received the properties through intracorporate transfers. And in any event, the possibility of unfair recovery proposed by Lavender isn't reason to categorically prohibit subsequent purchasers from ever pursuing a slander of title claim. Instead, if a subsequent purchaser has adequately pleaded that it has been damaged in some way, the case should survive a motion to dismiss, thereby allowing the jury to decide the resultant question of whether the purchaser was actually damaged.

¶66 Here, at the close of trial, the jury found that FCOI Preserve had proved that Lavender's slanderous statement caused it to incur special damages in the form of reduced sales. Lavender has

raised a number of claims regarding FCOI Preserve's ability to prove damages, and we address those below. For purposes of the motion to dismiss issue, however, we conclude that the district court committed no error when it held that even though FCOI Preserve obtained the properties later, it could still pursue a claim for slander of title. We reject Lavender's arguments to the contrary.

### III. Lavender's Rule 54(b) Motion and the Shelter Rule

¶67   Lavender next argues that the district court erred in concluding that, for purposes of Lavender's request for declaratory judgment, FCOI Preserve qualified as a bona fide purchaser under what has sometimes been referred to as "the shelter rule." Lavender argues that (1) the shelter rule "does not apply to slander of title actions" and (2) the shelter rule did not protect FCOI Preserve in this case "because it had actual or constructive notice of Lavender's interest in the property." We disagree with Lavender on both fronts.[13]

¶68   First, we agree with the district court that the shelter rule can apply to a slander of title claim. The shelter rule is a "common law doctrine that exists to prevent the stagnation of property," and "many states have recognized [it] in one form or another." *Nampa Highway Dist. No. 1 v. Knight*, 462 P.3d 137, 143 (Idaho 2020)

---

13. Lavender has again failed to specifically identify the particular ruling he's challenging. But from the context of the briefing and the record, it seems clear enough that, with this issue, Lavender is intending to challenge the district court's denial of his rule 54(b) motion to set aside the earlier ruling granting summary judgment.

   We also note that, in addition to the two arguments we've identified, Lavender briefly asserts that the district court erred by "adopt[ing] the shelter rule sua sponte." Lavender provides little support or analysis for this assertion, however, so we reject it on grounds of inadequate briefing.

(quotation simplified). Under its terms, "even if a subsequent purchaser is not a bona fide purchaser, if they took an interest in their property from a bona fide purchaser, they may be vicariously sheltered in the latter's protective status." *Id.*

¶69 Although no Utah case has expressly adopted the shelter rule, FCOI Preserve argues that its core concepts are already "part of the common law of Utah" and are also "built into Utah statutory law." We agree. In support of its Utah common law argument, FCOI Preserve points to *Utah Farm Production Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904 (Utah 1986) (per curiam). But we need not definitively determine whether this case essentially adopted the shelter rule. This is so because we agree with FCOI Preserve that it's *also* inherent in certain provisions of the Utah Code.

¶70 Under Utah Code section 57-3-102(5):

> The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest.

Utah Code section 57-3-103 then provides:

> Each document not recorded as provided in this title is void as against any subsequent purchaser of the same real property, or any portion of it, if:
>
> (1) the subsequent purchaser purchased the property in good faith and for a valuable consideration; and

> (2) the subsequent purchaser's document is first
> duly recorded.

Taken together, these statutes establish that a party who receives title from a bona fide purchaser takes the property free and clear of any interest that would be "void" against the bona fide purchaser. As explained, that's essentially the shelter rule. And that's likewise how the district court applied it here. The court concluded that since there was "no factual dispute that Fortress . . . qualified as a bona fide purchaser for value," "every entity that has or had interest in the Preserve property through Fortress['s] . . . chain of title has superior title to [Lavender's] trust deeds." As also noted, Drawbridge, FCOI, and FCOI Preserve each obtained their interests in the Preserve property through "intracompany transfers" in Fortress's chain of title. Like the district court, we conclude that these entities are therefore protected under the shelter rule if Fortress was in fact a bona fide purchaser.

¶71   This leads to Lavender's second argument, which is that the shelter rule did not protect FCOI Preserve in this case "because it had actual or constructive notice of Lavender's interest in the property." We again disagree.

¶72   The district court properly concluded that Fortress was a bona fide purchaser. "A bona fide purchaser is one who pays valuable consideration for a conveyance, acts in good faith, and takes without notice of an adverse claim or others' outstanding rights to the seller's title." *Davis v. Sperry*, 2012 UT App 278, ¶ 28, 288 P.3d 26 (quotation simplified); *see also* Utah Code § 57-3-103. "Notice of a prior interest may be actual or constructive." *Harman v. 105 Partners LLC*, 2024 UT App 109, ¶ 54, 556 P.3d 669 (quotation simplified). "Actual notice arises from actual knowledge of an unrecorded interest or infirmity in the grantor's title." *FDIC v. Taylor*, 2011 UT App 416, ¶ 36, 267 P.3d 949 (quotation simplified). And

constructive notice can include both (1) record notice which results from a record or which is imputed by the recording statutes, and (2) inquiry notice which is presumed because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact.

*Id.* (quotation simplified).

¶73　According to the district court, there was "no evidence that demonstrates that Fortress had any actual notice of the trust deeds" or that "the circumstances put Fortress on guard so as to require further inquiry about the trust deeds." Lavender has not persuaded us otherwise.

¶74　But because Fortress qualified as a bona fide purchaser, then, under the version of the shelter rule embodied in Utah's statutes, Fortress was entitled to pass along its interest to FCOI Preserve. Put differently, the issue isn't, as Lavender claims, whether FCOI Preserve had notice of Lavender's asserted interest. Rather, because FCOI Preserve was seeking shelter under *Fortress'*s status as a bona fide purchaser, the issue was whether *Fortress* had such notice. Because there was no evidence that it did, we agree with the district court's conclusion that the shelter rule applied and was an adequate reason to reject Lavender's request under rule 54(b) to reverse the earlier grant of summary judgment.

### IV. The Statute of Limitations and the Amended Counterclaim

¶75　As noted, FCOI Preserve was substituted as the counterclaim plaintiff in January 2020. In March 2022, FCOI Preserve filed an amended counterclaim under which it now explicitly sought damages for reduced sales prices caused by the slander of title. In September 2022, Lavender filed a motion for summary judgment, arguing that the amended counterclaim was

subject to a three-year statute of limitations, and that because all of the sales in question happened by 2017, the amended counterclaim was untimely. Lavender further argued that what he referred to as the "new cause[] of action" in the amended counterclaim could not relate back to the original counterclaim because it asserted "for the first time, allegations about injuries purportedly suffered by [FCOI Preserve] in its own behalf." The district court denied the motion. It held "as a matter of law that [FCOI Preserve's] amended counterclaim which asserts a single cause of action for slander of title relates back to the date of filing of [its] original counterclaim under Rule 15(c)(2) as interpreted and applied and explained in" *Noor v. State*, 2019 UT 3, ¶ 47, 435 P.3d 221. And the court further explained "that the amendment is justified by a good faith effort to have the operative pleading match the damages model that has been disclosed and litigated in this case for years."

¶76     On appeal, Lavender challenges that ruling, arguing, as he did before, that the relation-back doctrine did not apply. We disagree.[14]

¶77     Rule 15 of the Utah Rules of Civil Procedure governs amendments generally, and rule 15(c) governs the "relation back" doctrine more particularly. Under rule 15(c), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

---

14. As noted above in the Background, this wasn't the only statute of limitations ruling in this case. In July 2020, Lavender filed a previous motion for summary judgment that was based on the statute of limitations, asserting there that FCOI's original counterclaim was time-barred based on the timing of the assignment of interest from Drawbridge to FCOI. The district court denied that motion, and Lavender does not challenge that ruling on appeal.

out—in the original pleading." Utah R. Civ. P. 15(c)(2). This means that "when a new claim relates back to the date of the original pleading, a party may include it even when the statute of limitations has otherwise run on that claim." *Noor*, 2019 UT 3, ¶ 38 (quotation simplified). For purposes of this rule, "an amendment arises out of the same 'conduct, transaction, or occurrence' when it arises out of the same cause of action and alleges the same kind of factual basis as the original allegation." *Id.* ¶ 47 (quoting Utah R. Civ. P. 15(c)(2)). When confronted with questions that arise under rule 15, courts "liberally construe amendments to pleadings . . . to permit a complete adjudication of the matters in controversy." *Id.* ¶ 41. (quotation simplified).

¶78     Here, the only relevant change made in the amended counterclaim was that FCOI Preserve was now more specific about its theory of damages. The original counterclaim alleged that "[a]s a result of the recording of the Trust Deeds, [FCOI] has been unable to complete land sales which were anticipated and has suffered damages as a result," and from that allegation, it requested "actual or special damages." The amended counterclaim more explicitly alleged that "FCOI [Preserve] was forced to sell its properties in the Preserve at reduced prices due to Lavender['s] . . . Trust Deeds and has suffered damages as a result," and it accordingly requested "actual and special damages, in an amount to be proven at trial."

¶79     In our view, when FCOI Preserve expounded on its damages theory in the amended counterclaim, that change fit comfortably within the rule 15(c) "relation back" doctrine. After all, rule 15(c) applies when an amendment "asserts a *claim or defense* that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Utah R. Civ. P. 15(c)(2) (emphasis added). Here, while the damages theory may have changed, the "claim" itself didn't. In the original counterclaim, FCOI asserted a claim for slander of title, and that claim was based on Lavender improperly recording his trust

deeds in September 2007. So too with the amended counterclaim, which asserted the same claim for slander of title based on the same alleged conduct from Lavender.

¶80   This conclusion finds support in *Behrens v. Raleigh Hills Hospital, Inc.*, 675 P.2d 1179 (Utah 1983). There, the plaintiff filed a wrongful death action, "seeking compensatory damages only." *Id.* at 1181. The case proceeded to trial, where the jury awarded $100,000 in damages. *Id.* The district court then granted the defendant's motion for a new trial on an unrelated issue, after which the "plaintiff moved to amend her complaint to include a claim for punitive damages." *Id.* The district court denied the motion to amend, but our supreme court reversed, holding that "if the plaintiff were able to adduce the necessary foundational evidence at trial, she could claim punitive damages under Rule 54(c) without a formal amendment to the pleadings." *Id.* at 1181–82; *see also* Utah R. Civ. P. 54(c) ("Every other judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."). The supreme court explained that an "amendment to include [punitive] damages does not import into a case a new and different cause of action." *Behrens*, 675 P.2d at 1182.

¶81   Others have recognized this same principle too. The California Court of Appeal, for example, has held that "an amendment seeking new damages relates back to the original complaint if such damages resulted from the same operative facts—i.e., the same misconduct and the same injury—previously complained of." *Amaral v. Cintas Corp. No. 2*, 78 Cal. Rptr. 3d 572, 606 (Cal. Ct. App. 2008). And this principle likewise finds support in relevant treatises. *See, e.g.*, 54 C.J.S. *Limitations of Actions* § 332 (2024) ("An amendment altering the prayer of the petition or the remedy sought, in order to enable the court to award the relief to which the plaintiff is entitled on her cause of action, does not introduce a new cause of action so as to be subject to a plea of limitations, as when an amendment is filed claiming increased

damages."); 6A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1497 (3d ed. 2024) ("[A]mendments increasing the amount claimed in the prayer for relief or changing a demand for equitable relief to one for legal relief, although actually unnecessary in light of Rule 54(c), have been held to relate back.").

¶82   In his brief, Lavender pushes back, pointing to *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, where we held that the relation back rule "generally does not apply to an amendment which substitutes or adds new parties whether plaintiff or defendant." 2016 UT App 89, ¶ 11, 372 P.3d 683 (quotation simplified). But as discussed, the amended counterclaim didn't add a new party. FCOI Preserve was added in January 2020 through the substitution motion, not through the amended counterclaim in March 2022. In any event, in *Dos Lagos*, we recognized that there's an "exception" to this rule that applies when the "new and old parties have an identity of interest; so it can be assumed or proved the relation back is not prejudicial." *Id.* ¶ 12. (quotation simplified). We noted that the "rationale of rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Id.* ¶ 14 (quotation simplified). And we further noted that the "same general standard of notice applies regardless of whether a litigant seeks to add defendants, plaintiffs, or claims." *Id.* (quotation simplified). As discussed, there was an identity of interest here. FCOI (the original counterclaim plaintiff) and FCOI Preserve (the amended counterclaim plaintiff) were each subsidiaries of Fortress, and, through the slander of title claim, they each asserted an interest in the same properties based on the same original underlying loan and trust deed. Our decision in *Dos Lagos* therefore does not compel a different result here.

¶83   In short, after the original counterclaim was filed, Lavender was on notice that he was being sued for improperly

recording trust deeds in September 2007. The amended counterclaim didn't change that. As a result, we see no basis for reversing the district court's denial of the motion for summary judgment that was based on the statute of limitations.

## V. Privileges

¶84    As discussed, the slander of title claim was based on Lavender filing his trust deeds in September 2007. Lavender now argues that this act was "absolutely immune under the judicial proceedings privilege" and conditionally immune under the rival claimant's privilege. We disagree on both fronts.[15]

---

15. As with some of the prior issues that we've addressed, it's again unclear from his brief which ruling Lavender is targeting, particularly given that these privilege issues were raised and ruled on in various places below. In its responsive brief, FCOI Preserve assumes that the ruling at issue is the ruling that denied the request for a directed verdict. From our review of the briefing and the record, we largely assume as much too. But we note that, with respect to the absolute privilege issue, it would not necessarily matter which ruling was at issue, since the question turns on a question of law that would be reviewed for correctness. *See Price v. Armour*, 949 P.2d 1251, 1254 (Utah 1997). That said, for the conditional rival claimant privilege that's also at issue, the standard of review is a touch more nuanced—namely, the question of "whether a publication is conditionally privileged is a question of law, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice." *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 53, 116 P.3d 271 (quotation simplified). As we explain below, since this conditional privilege turns in some measure on a factual question, and since that question was then resolved in FCOI Preserve's favor at trial, the court correctly

(continued…)

A.      Judicial Proceedings Privilege

¶85    "The common law judicial proceeding privilege immunizes certain statements that are made during a judicial proceeding from defamation claims. The privilege is intended to promote the integrity of the adjudicatory proceeding and its truth finding processes." *Pratt v. Nelson*, 2007 UT 41, ¶ 27, 164 P.3d 366 (quotation simplified). "It does so by facilitating the free and open expression by all participants," which would "only occur if they are not inhibited by the risk of subsequent defamation suits." *Id.* (quotation simplified). The privilege also "extend[s] to an attorney's conduct occurring in the course of judicial proceedings." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 35, 285 P.3d 1157. And to "establish absolute immunity" under this privilege, the statements (or conduct) in question "must be (1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *Pratt*, 2007 UT 41, ¶ 28 (quotation simplified).

¶86    The parties in this appeal dispute whether Lavender can satisfy the first element, so we focus our attention there as well. The first element "is interpreted broadly," and it "extends to statements made prior to the filing of a lawsuit because it is intended to encourage reasonable efforts to resolve disputes prior to the filing of a complaint." *Id.* ¶ 29 (quotation simplified); *see also Krouse v. Bower*, 2001 UT 28, ¶ 10, 20 P.3d 895 ("Because the purpose of the privilege is to promote the resolution of disputes, it should be interpreted to encourage this end.").

¶87    In *Pratt*, our supreme court cited *Beezley v. Hansen*, 286 P.2d 1057 (Utah 1955), to support its position that the privilege applies

---

denied both the pretrial and posttrial motions that implicated this privilege.

to "certain pretrial" statements. *Pratt*, 2007 UT 41, ¶ 29 & n.48. In *Beezley*, the court quoted the following provision from the Restatement:

> The publication of defamatory matter by an attorney is protected not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and other communications preliminary thereto. The institution of a judicial proceeding includes all pleadings and affidavits necessary to set the judicial machinery in motion.

*Beezley*, 286 P.2d at 1058 (quoting Restatement (Second) of Torts § 586 (Am. L. Inst. 1977)). In this vein, our supreme court has also held that a demand letter that threatened legal action was subject to the judicial proceedings privilege. *See Krouse*, 2001 UT 28, ¶¶ 1, 10.

¶88   From all this, it seems that while the judicial proceedings privilege can in some circumstances apply to pre-litigation statements, it only does so when the statements can fairly be viewed as being "preliminary" to anticipated litigation, including statements that were made in an attempt to resolve a dispute before a complaint was filed.

¶89   As recognized by the district court, however, this was not the case here. Lavender's trust deeds were recorded in 2007, nearly four years before Lavender filed his complaint. At the time that Lavender filed his trust deeds, there was no apparent threat of a lawsuit and the parties weren't engaged in any settlement negotiations. Indeed, on their face, the point of the trust deeds wasn't to initiate or even forestall litigation. Rather, the trust deeds were legal documents purporting to establish a security interest in the identified properties, and the act of recording them was designed to notify others of that claimed interest. Thus, we agree with the district court that the act of recording the trust

deeds was not done "during or in the course of a judicial proceeding." *Pratt*, 2007 UT 41, ¶ 28 (quotation simplified).

¶90    Moreover, we also agree with FCOI Preserve's contention that it would make little jurisprudential sense to allow this privilege (which, again, is derived from the common law) to cover this kind of conduct, at least as a defense to a slander of title claim. Lavender asserts that the act of recording the trust deeds was "closely related" to the eventual litigation. It's of course true that this act is what led to the litigation, insofar as it formed the basis for FCOI's slander of title claim. But the very reason that the slander of title tort exists is to provide "for special damages for the loss sustained by reason of the publication of the slander." 103 Am. Jur. Trials 1 *Slander of Title Claims* § 2 (2025). To serve this purpose, it commonly applies to the very kind of conduct at issue here—the act of publishing "a slanderous statement . . . that is derogatory or injurious to the legal validity of an owner's title or to his or her right to sell or hypothecate the property." *First Sec. Bank of Utah, N.A. v. Banberry Crossing*, 780 P.2d 1253, 1257 (Utah 1989) (quotation simplified).

¶91    If this court embraced Lavender's proposed application of the judicial proceedings privilege to this tort, this privilege would, as a practical matter, largely negate most claims for slander of title. And it would further enable unsavory actors to do the very thing that the tort is designed to penalize—knowingly file false documents that assert ownership interests over properties that belong to others, thereby clouding title to those properties. We see no basis for allowing this privilege to essentially swallow this tort in this manner. For this additional reason, we affirm the district court's determination that Lavender's conduct was not protected by the judicial proceedings privilege.

B.    Rival Claimant Privilege

¶92    Lavender also argues that his conduct was covered by what he refers to as the "rival claimant privilege." Lavender

points to no Utah case that has applied the particular privilege he asserts here, however, let alone in this manner.[16] Instead, he points to a Restatement provision that provides that "[a] rival claimant is conditionally privileged to disparage another's property in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself." Restatement (Second) of Torts § 647 (Am. L. Inst. 1977). In Lavender's view, since he was a rival claimant, the burden was on FCOI Preserve to show that the rival claimant privilege did not apply, and he then argues that since FCOI Preserve failed to do so, "the judgment must be vacated." In its brief, however, FCOI Preserve asserts that the proposed "qualified privilege would make no sense as a defense to a slander of title claim." We readily agree with FCOI Preserve on this point, particularly in light of the jury's verdict at the close of trial.

¶93 As explained in a comment to the same Restatement provision that Lavender relies on, the rival claimant privilege allows a "publisher to assert a claim to a legally protected interest of his own *provided that the assertion is honest and in good faith*, even though his belief is neither correct nor reasonable." *Id.* § 647 cmt. b (emphasis added). Thus, according to the Restatement, a statement made in "[b]ad faith is treated as an abuse of the privilege" and provides no defense. *Id.* § 647 cmt. d.

---

16. Lavender does point to two Utah cases that applied other kinds of conditional privileges to the tort of defamation. *See O'Connor v. Burningham*, 2007 UT 58, ¶¶ 34–37, 165 P.3d 1214 (recognizing an intra-family relationship privilege to defamation); *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58–59 (Utah 1991) (recognizing an employer-employee communications privilege to defamation). But for the reasons explained here, we conclude that the slander of title tort is sufficiently different, particularly as it relates to the kind of conduct at issue.

¶94 As noted above, however, in Utah, a slander of title claim requires proof that both "the statement was false" *and* "the statement was made with malice." *Dillon*, 2014 UT 14, ¶ 36 (quotation simplified); *see also Neff*, 2011 UT 6, ¶ 79. "For a slanderous statement to be malicious, the defendant must have actually known that it was false or misleading." *Dillon*, 2014 UT 14, ¶ 36 (quotation simplified). And a finding of malice necessarily precludes a finding of good faith. *See Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 53 n.19, 116 P.3d 271 (explaining that while "the concept of 'malice' . . . is distinct from [that of] 'actual malice,'" "proof of knowledge of or reckless disregard for a statement's falsity would satisfy either standard"); *Davidson v. Baird*, 2019 UT App 8, ¶ 51, 438 P.3d 928 ("A statement made with a good-faith belief in its accuracy is not a statement made with actual malice."). For this reason, if a plaintiff is able to prove his or her slander of title claim at trial, this necessarily means that the privilege proposed by Lavender did not apply.

¶95 Indeed, this was the very reason given by the district court in its ruling rejecting the argument Lavender made in his request for a directed verdict. As explained by the court:

> Under Utah law, a finding of malice would vitiate any conditional privilege defense that might apply. If the factfinder determines that FCOI [Preserve] failed to meet its burden, then [Lavender] will prevail without the need for an instruction related to conditional privileges. On the other hand, if the factfinder determines that FCOI [Preserve] met its burden, the conditional privilege could not be met because of the finding of malice. This analysis is supported by comments in the injurious falsehood section of MUJI 2nd and relevant case law. Thus, no separate instruction regarding conditional privilege is necessary.

¶96    Here, the jury was instructed that for FCOI Preserve to succeed on its slander of title claim, "FCOI Preserve must prove the following elements: (1) [Lavender] published a slanderous statement; (2) the statement was false; (3) *the statement was made with malice*; and (4) the statement caused specific monetary loss to FCOI Preserve." (Emphasis added.) At the close of trial, the jury returned a verdict finding Lavender liable to FCOI Preserve for slander of title.

¶97    In short, the question of "whether a publication is conditionally privileged is a question of law, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice." *Wayment*, 2005 UT 25, ¶ 53 (quotation simplified). Because the proposed privilege turned on a question of good faith versus malice, and because that same question was going to be submitted to the jury at trial, we agree with the district court that there would have been no basis on this record for holding, before trial, that the statements in question were conditionally privileged. And we further conclude that since the jury determined that FCOI Preserve had met its burden of establishing malice by a preponderance of the evidence, there was likewise no basis for the court to conclude after trial that the rival claimant privilege applied.

## VI. Damages

¶98    Lavender next makes two arguments relating to damages—namely, that FCOI Preserve failed to sufficiently plead or prove special damages, and that the district court also erred in allowing FCOI Preserve to recover damages "as to the 21 stigma lots." We address and reject these arguments in turn.

A.      Special Damages

¶99     Lavender argues that FCOI Preserve failed to adequately plead or prove special damages. We reject this argument for inadequate briefing.

¶100    In the opening brief, a party "must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). "Appellants carry the burden to persuade a reviewing court through reasoned, supported argument that the district court committed harmful, reversible error—a burden that necessarily requires the appellant to address the reasoning and basis of the district court's ruling and to explain why that court got it wrong." *Cottam v. IHC Health Services Inc.*, 2024 UT App 19, ¶ 15, 544 P.3d 1051 (quotation simplified); *see also Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903 ("If an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision."). "When an appellant's brief fails to satisfy the minimal requirements of rule 24, we need not discuss the merits of the case." *Cottam*, 2024 UT App 19, ¶ 15 (quotation simplified). "And an appellant's claim is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *Id.* (quotation simplified).

¶101    In several places in this opinion, we've noted that it was unclear to us which ruling, exactly, Lavender was challenging. But in each prior instance, we deemed it appropriate to address the issue, either because the record made it clear enough which ruling Lavender was challenging, or instead because the differences between the various potential rulings didn't matter.

¶102    But this issue is different. As noted, it took over 11 years to get this case to trial. Over the course of those years, the parties litigated dozens of motions. The record spans almost 10,000 pages.

¶103 During that lengthy process, the district court issued several rulings relating to whether FCOI (or, later, FCOI Preserve) had properly pleaded or could prove special damages. Of particular note here, these included the following:

- In February 2022, Lavender filed a motion to dismiss, arguing that the counterclaim failed to comply with the specificity requirements for pleading special damages found in rule 9 of the Utah Rules of Civil Procedure. Alternatively, Lavender argued that FCOI Preserve should be limited to the damages pleaded in the 2014 counterclaim. FCOI Preserve opposed the motion, contending that it had properly pleaded special damages; in the alternative, it requested leave to amend its counterclaim. The district court denied Lavender's motion to dismiss and granted FCOI Preserve leave to file an amended counterclaim.

- At the close of FCOI Preserve's case at trial, Lavender filed a motion for directed verdict, arguing that FCOI Preserve had presented no evidence of "specific monetary loss or special damages, only general damages." The district court deferred ruling on the motion until FCOI Preserve had a chance to respond, and it later denied the motion.

- After trial, in December 2022, Lavender filed a motion for judgment as a matter of law, arguing that "FCOI [Preserve] did not present any evidence of special damages." The district court denied this motion as well, finding that FCOI Preserve's "witnesses including its expert witnesses provide[d] evidence from which a reasonable jury could find that FCOI [Preserve] suffered special damages in the form of reduced sales proceeds from lots actually sold caused by [Lavender's] recording of the trust deeds against the ten lots against which those trust deeds were recorded."

¶104   It is unclear from Lavender's opening brief which of these rulings Lavender is actually challenging. Lavender speaks in general terms about the perceived problems of pleading and proof with respect to FCOI Preserve's damages claim. But whether it be in his Statement of the Issues, his headings, or in his Argument, Lavender never specifically identifies which ruling he intends for us to reverse with respect to these arguments.[17]

¶105  This failure is particularly problematic given that the rulings we've just identified (which seem to us to be the ones that Lavender most likely has in mind) are subject to different standards of review (which Lavender likewise fails to address at all in his opening brief). A denial of a motion to dismiss is reviewed for correctness, and this standard of review "grants no deference to the decision of the district court." *Moulding Invs.*, 2024 UT App 23, ¶ 21 (quotation simplified). A denial of a motion for directed verdict is reviewed by "examining all evidence in a light most favorable to the non-moving party" to determine whether there is any "competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 (quotation simplified). A denial of a motion for judgment as a matter of law is reviewed for "correctness, and in doing so [the court] accept[s] as true all testimony and reasonable inferences that support the jury's

---

17. In his Statement of the Issues, for example, Lavender doesn't have an entry that corresponds to this issue, even though it has its own heading and discussion in the Argument portion of his brief. In other words, there's a mismatch between the number of issues set forth in his Statement of the Issues on the one hand and the number of issues he sets forth in his headings and text on the other. This problem matters here because, in a rules-compliant brief, there would be a citation in the preservation section (which, under our rules, is linked up with the issues) that would give some guidance as to which ruling the appellant intended to challenge.

verdict." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 38, 513 P.3d 729 (quotation simplified). In addition, if Lavender actually means to challenge the decision to allow FCOI Preserve to amend its counterclaim (which also has some bearing on this legal issue), that decision would be reviewed for an abuse of discretion. *See Red Cliffs Corner, LLC v. J.J. Hunan, Inc.*, 2009 UT App 240, ¶ 32, 219 P.3d 619.

¶106   An appellant carries the burden of persuasion on appeal, and to carry this burden, it's "the appellant's job to tell us where and how the district court went wrong." *Pinder v. Duchesne County Sheriff*, 2020 UT 68, ¶ 36, 478 P.3d 610. One part of telling the appellate court where the district court went wrong is telling the court which ruling contains the alleged error, and we've said as much in several cases. *See, e.g.*, *Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 46, 424 P.3d 1154 ("[B]ecause [a]ppellants fail to even clearly identify which of the trial court's rulings they challenge, they have not carried their burden of persuasion on appeal."); *Wing v. Still Standing Stable LLC*, 2016 UT App 229, ¶ 27, 387 P.3d 605 ("Because [appellant] does not identify the ruling appealed from or deal with the issues it presents, we reject this claim."); *Elite Legacy Corp. v. Schvaneveldt*, 2016 UT App 228, ¶ 67, 391 P.3d 222 (noting that we were "hampered in our review of this claim of error because, as [appellees] observe, 'it is unclear which ruling or rulings [appellant] is appealing,'" particularly where appellant's brief did "not identify in the record the ruling he challenges").

¶107   To be clear, we don't intend to invite appellees to now reflexively argue that an issue was inadequately briefed simply because the appellant failed to use some combination of magic words. In many, if not most, instances, it will likely be clear enough from the arguments made in the opening brief (including, most notably, the preservation section) which ruling is being challenged. But in a case involving a particularly lengthy record, an appellant's failure to guide the court to the appropriate place

in the record is more important than normal. *See Allen*, 2008 UT 56, ¶ 9 (noting that an "appellate court is not a depository in which a party may dump the burden of argument and research" and that an appellant "must plead his claims with sufficient specificity for this court to make a ruling on the merits" (quotation simplified)). And if a legal doctrine was raised by a party several times and considered by the district court in multiple rulings, and if those rulings would be reviewed under different standards of review, identifying the ruling that is being challenged is even more important. Put simply, if it's unclear from the brief and the context of the case which ruling the appellant is asking the appellate court to reverse, and if that difference matters in some way (such as for preservation or standard of review purposes), the appellate court would essentially be making litigation choices for the appellant if it were to decide for itself which ruling it would choose to review. Because this is the case here with respect to special damages, we decline to address this issue.

B.      "Stigma" Damages

¶108   Lavender next argues that FCOI Preserve's request for "stigma" damages on the 21 lots that were not encumbered by his trust deeds was "neither pleaded nor supported by evidence." In support of both aspects of this claim, Lavender relies on Utah Code section 57-1-37, which provides:

> (1) The failure of an owner of real property to disclose that the property being offered for sale is stigmatized is not a material fact that must be disclosed in the transaction of real property.
>
> (2) Neither an owner nor his agent is liable for failing to disclose that the property is stigmatized.

From this, Lavender argues that "stigma is not relevant and incapable of disparaging title—even if publication had been shown." In other words, and so far as we can understand the

argument, Lavender seems to be suggesting that any damages to the 21 lots not directly encumbered by his trust deeds should have been regarded as "stigma" damages, and that under the terms of this statute, he could not be found liable for causing that "stigma." We disagree.[18]

¶109 Under the plain language of the controlling statute, the kinds of damages at issue here do not qualify as stigma damages for purposes of this statute. The stigma statute is governed by a definitions statute under which the term "'[s]tigmatized' means" the following:

(a) the site or suspected site of a homicide, other felony, or suicide;

(b) the dwelling place of a person infected, or suspected of being infected, with the Human Immunodeficiency Virus, or any other infectious disease that the Utah Department of Health determines cannot be transferred by occupancy of a dwelling place; or

(c) property that has been found to be contaminated, and that the local health department has subsequently found to have been decontaminated.

Utah Code § 57-1-1(4). A cloud on title resulting from the improper recording of trust deeds does not fall within the rubric of any of these categories. The stigma statute therefore has no bearing on this case, and the district court committed no error

___

18. From the briefing, we understand Lavender's assertion that FCOI Preserve did not "plead" these damages to be a challenge to the district court's denial of his motion in limine on this issue, while we understand his assertion that these damages were not "supported by evidence" to be a challenge to the district court's denial of his mid-trial motion for a directed verdict.

(either pretrial or during trial) in denying Lavender's motions relating to this issue.[19]

_____

19. In his brief, Lavender repeatedly suggests that FCOI Preserve could not recover damages for the 21 lots that were not encumbered by his trust deeds. But in every such instance, Lavender did so in conjunction with his argument that FCOI Preserve could not recover for "stigmatized" lots. Of particular note, that's how Lavender framed the issue in his Statement of the Issues, and Lavender is of course free to frame his issues however he sees fit. For the reasons just given, we see no basis for concluding that these lots fell under the "stigma" statute at all.

We recognize that in some case, we may be asked to answer the question that's lurking in the shadows here—namely, if a single entity (likely a developer) owns multiple lots and there has been a slanderous statement that was made about just some of them, can the owner recover damages if it can prove that the statement depressed the values for the other lots too, or is the owner instead limited to receiving damages for only the lots directly affected by the slanderous statement? But since it's not clear that Lavender meant to raise this as an issue outside the context of the "stigma" statute, it's not clear that we are even being asked to answer that question. And if Lavender meant to implicitly raise it, Lavender has not pointed to any authority or adequately developed an argument to support his apparent view on this nuanced question. As a result, we conclude that he has not carried his burden of persuasion. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196 ("An appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." (quotation simplified)). But in resolving this potential issue on this limited basis, "we leave open the possibility that, if some future case arises in which" this issue is "better presented, we may consider [it] anew." *Keisel v. Westbrook*, 2023 UT App 163, ¶ 52 n.9, 542 P.3d 536, *cert. denied*, 554 P.3d 1097 (Utah 2024).

VII. Prejudgment Interest

¶110  At the close of trial, the jury returned a verdict finding Lavender liable to FCOI Preserve for slander of title. Using a special verdict form, the jury awarded damages on a lot-by-lot basis, ultimately awarding FCOI Preserve $1,416,730 in damages. FCOI Preserve's proposed final judgment included an award of prejudgment interest. Lavender opposed the inclusion of prejudgment interest on multiple grounds, including that it was unavailable in this kind of case and that FCOI Preserve's proposed amount was improperly calculated. The district court disagreed. In the final judgment, the court ruled that "FCOI Preserve is entitled to prejudgment interest on its damages at a rate under Utah law base[d] upon application of Utah Code section 15-1-4," and it awarded interest at the "applicable rate of 6.73%" set forth in the then-controlling rule. Based on the jury's overall damages award, it accordingly awarded $677,419 in prejudgment interest.

¶111 Lavender now challenges that award on appeal. In Lavender's view, (1) prejudgment interest could not be awarded in this case, and (2) even if it could be, the interest was improperly calculated. We disagree.

¶112  "A prejudgment interest award is proper when the damage is complete, the loss can be measured by facts and figures, and the amount of loss is fixed as of a particular time." *Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 52, 69 P.3d 297 (quotation simplified). This is sometimes referred to as "the *Fell* standard." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 19, 82 P.3d 1064 (citing *Fell v. Union Pac. Ry. Co.*, 88 P. 1003 (Utah 1907)). On the other hand, "courts will not award prejudgment interest in cases where the trier of fact has to use its best judgment in assessing the amount to be allowed for past as well as for future injury," *KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 81, 436 P.3d 151 (quotation simplified), such as "personal injury

cases, cases of death by wrongful act, libel, slander, false imprisonment and all cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of trial," *Smith*, 2003 UT 41, ¶ 20 (quotation simplified).

¶113 Our supreme court has explained that it is "reluctant to award prejudgment interest for unrealized profits." *USA Power LLC v. PacifiCorp*, 2016 UT 20, ¶ 100, 372 P.2d 629 (quotation simplified). But in *Smith*, our supreme court cited with approval two of its earlier cases–*San Pedro, Los Angeles & Salt Lake Railroad Co. v. Board of Education*, 99 P. 263 (Utah 1909), and *Kimball v. Salt Lake City*, 90 P. 395 (Utah 1907)—for the proposition that "fair market valuations of real property are within the category of damages upon which prejudgment interest may properly be awarded." *Smith*, 2003 UT 41, ¶ 21. It explained that, in such an instance, "'for the purpose of fixing damages, the injury is complete; the damages are ascertained by the ordinary rules of evidence and according to a known standard or measure of value. And all this must be determined from competent evidence, which is binding upon both the court and jury.'" *Id.* (quoting *San Pedro*, 99 P. at 267).

¶114 Here, FCOI Preserve called an expert to testify about reduced sales prices—i.e., "the difference between the market value for each lot . . . and the actual sales price received for each lot." This instance thus falls comfortably within the *Smith/San Pedro* rule. While it's true that the jury did not award the exact amount of damages to which FCOI Preserve's expert testified, this wrinkle doesn't mean that the district court was prohibited from awarding prejudgment interest. To the contrary, our supreme court has explained that what matters is whether the "damage figures are subject to calculation," so "even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 55, 210 P.3d 263. As explained, FCOI Preserve's damages were subject to calculation. As FCOI

Preserve points out in its brief, "[t]he actual sales prices were fixed on the date of the sale, were ascertainable, and indisputable," and "[t]he market values were also fixed as of the date of the sale and ascertainable." Thus, we conclude that the district court was correct to award prejudgment interest.

¶115  Lavender also argues that the district court improperly calculated prejudgment interest. In his view, the district court should have used a variable rate that accounted for fluctuations in historical postjudgment interest rates from 2014 to 2023, rather than relying on the postjudgment interest rate from 2023. But he points to no authority indicating that the district court was required to do so.

¶116 Moreover, our court has affirmed an award of prejudgment interest based on the rate provided in our postjudgment interest rate statute. *See Kealamakia, Inc. v. Kealamakia*, 2009 UT App 148, ¶ 16, 213 P.3d 13. Our postjudgment interest statute provides that "final civil and criminal judgments . . . shall bear interest at the federal postjudgment interest rate as of January 1 of each year, plus 2%." Utah Code § 15-1-4(3)(a). That rate is fixed "for the duration of the judgment." *Id.* § 15-1-4(3)(b). And this is the rate that the district court applied here.[20]

¶117  We therefore hold that the district court did not err in awarding prejudgment interest to FCOI Preserve.

---

20. Utah's postjudgment interest rates are available online. *See Historic Post Judgment Interest Rates*, Utah State Courts, https://www.utcourts.gov/en/court-records-publications/resources/interest-rates/historic.html [https://perma.cc/C4MS-ERTC]. In 2023, the postjudgment interest rate was 6.73%, *see id.*, which is the rate that the district court applied here.

CONCLUSION

¶118 Lavender has challenged a large number of the district court's rulings. For the reasons set forth above, we see no basis for reversing any of them. The verdict and judgment are therefore affirmed.

———————